# STANDARD LIFE INS. CO. OF THE SOUTH v. STRONG.

Middle Section.    August 10, 1935.

Petition for Certiorari denied by Supreme Court, January 11, 1936.

Tyne, Peebles, Henry & Tyne, of Nashville, and J. W. Holman, of Fayetteville, for Standard Life Ins. Co.

W. B. Lamb, Jr., of Fayetteville, for Mrs. Strong.

FAW, P. J.  The bill in this case was filed in the chancery court of Lincoln county on June 3, 1932, by Standard Life Insurance Company of the South against Mrs. Floriene A. Strong, a resident citizen of Lincoln county, Tenn., to procure the cancellation and surrender of a policy of insurance issued by complainant on the life of Tom Griffis Strong.

The complainant is a Mississippi corporation engaged in the business of life, health, and accident insurance, with its principal office and place of business in the city of Jackson, Miss., and duly authorized to do such business in the state of Tennessee.

The policy involved in this suit was issued on February 23, 1932, and provided for the payment by complainant of the sum of $10,000 to the wife of the insured, Floriene A. Strong (the defendant herein), payable in installments as specified in the policy, and the beneficiary, defendant Floriene A. Strong, was in possession of said policy when this suit was brought.

The policy in question was, according to its terms, issued by complainant in consideration of an application therefor (a copy of which application was attached to and made a part of the policy), and of the payment of a premium of $278.80 on delivery of the policy, and of the payment of a like sum on or before the 23d day of each February thereafter until premiums have been paid for forty-two full years, including the first, or until the prior death of the insured.

Tom Griffis Strong, the insured, died on April 7, 1932.

In its bill, complainant alleged that the insured had paid to it the sum of $278.80, as the premium for the first policy year, and that complainant had theretofore made a legal tender of that sum, with interest, to defendant, or her representative, and that such tender had been refused; and, at the time complainant filed its bill, it paid into the registry of the chancery court of Lincoln county the aforesaid sum of $278.80, with legal interest thereon from February 23, 1932, to the date of such payment into court, as a continuing tender "for the use and benefit of the defendant hereto, and/or administrator or executor of the estate of said Tom Griffis Strong, and/or other person or persons entitled thereto."

In the chancery court, issues of fact were submitted to a jury demanded by the defendant, and, upon the findings of the jury (which were in part directed by the chancellor), the chancellor dismissed the complainant's bill and granted the original defendant a decree against the insurance company under a cross-bill filed by her, from which decree the defendant insurance company prayed an appeal in the nature of a writ of error, which was granted by the chancellor and perfected by the complainant. The questions for decision by this court arise, therefore, upon assignments of error filed by the appellant insurance company.

It is alleged in complainant's bill that the applicant, Tom Griffis Strong, made false answers to certain questions propounded to him in the aforesaid application for the insurance policy involved in this case, and thereby misrepresented material facts in the procurement of said policy; that, if truthful answers had been given by the applicant to the questions specified in the bill, said application would have been rejected by complainant and the policy would not have issued.

The pleadings are sufficient to present all the issues of fact and law which were decided by the jury and the chancellor, respectively, and we will not extend this opinion by a detailed statement of the pleadings.

It is alleged in the complainant's bill that the applicant made false answers to subsection B of question 7 in the application, which question and the answer thereto were as follows:

"Question 7. Have you ever had or been treated for any disease or disturbance of: (Answer each separately) (B) Lungs, (tuberculosis, pleurisy, pneumonia, asthma). Answer. No."

Plaintiff alleges that the answer to the question just quoted was false, in that, the applicant, Tom Griffis Strong, had pleurisy in 1925 or 1926 and again in 1928 and was treated therefor by a physician or physicians at said times, and that the death of said Tom Griffis Strong "was due to pneumonia and pleurisy complications."

It is further alleged in the bill that the applicant made false answers to questions appearing as subsection (D) of question 2 in part II of the application, and question 14 of part I thereof, which questions and the answers thereto were as follows:

"Part II, Question 2: 'D' Has your application for Life, Accident or Health insurance ever been declined, postponed, or limited to a policy different from the one applied for, or has any such policy issued to you been cancelled or renewal thereof refused? (State Company and details). Answer. No."

"Part I. Question 14. I have never made an application for any life, Accident or Health Insurance upon which a policy was issued at an increased rate, or upon which a policy was not issued, or if issued, was cancelled or recalled, except: Answer: No."

408

The allegations of fact upon which complainant predicates its claim that the foregoing answers were false are fully stated in the bill, but, as they will sufficiently appear in our subsequent statement of the record herein, it is unnecessary to state them at this time. The issues of fact made up by the parties, under the direction of the court, to be submitted to the jury, were as follows:

"Question 1. Had the applicant, Tom Griffis Strong, prior to the date of the application for the policy of insurance in question, that is January 29, 1932, ever had or been treated for pleurisy?

"Question 2. Was the refusal of the Insurance Company to pay the policy sued upon wilful and without a reasonable cause?

"Question 3. Did the Cross-Complainant, Mrs. Strong, incur an expense in her endeavor to collect the insurance on her husband's life and the amount of expense incurred?

"Question 4. Was the following question asked Tom Strong by D. T. Hardin, Medical Examiner:

" 'D. Has your application for Life, Accident or Health insurance ever been declined, postponed, or limited to a policy different from the one applied for, or has any such policy issued to you been cancelled or renewal thereof refused? (State Company and details.)'

"Question 5. Did Tom Strong make the following statement in his application:

" '14. I have never made an application for any Life, Accident or Health Insurance upon which a policy was issued at an increased rate, or upon which a policy was not issued, or if issued, was cancelled or recalled'?"

On motion of the complainant, made at the conclusion of all the evidence, the chancellor directed the jury to answer question No. 1 "Yes," question No. 2 "No," and question No. 4 "Yes," and instructed the jury that it was unnecessary to answer question No. 3 in view of the answer to question No. 2.

Complainant's motion for a directed verdict on issue No. 5 was overruled, and the chancellor submitted question No. 5 to the jury, and to this question the jury answered "No."

Thereupon the chancellor decreed as follows:

"That the cross-complainant have and recover of the cross-defendant, Standard Life Insurance Company of the South, the sum of Twenty-one Hundred Dollars ($2,100.00) as principal due under said policy, together with interest from the day said various installments were due, amounting to One Hundred Ten Dollars and Twenty-five Cents ($110.25), and that the cross-complainant also have and recover, from time to time, of the cross-defendant said installments not yet due, as they become due and payable, and that this cause be retained in court to carry this portion of the decree into effect, and that the cross-complainant also have

and recover of the cross-defendant the costs of the cause, for all of which execution will issue.''

In due season, the complainant moved the court to vacate and set aside the aforesaid decree and to render a decree in its favor and/or grant it a new trial upon numerous grounds set out in its motion. The decree was thereupon set aside solely for the consideration of complainant's said motion; but the motion was overruled, and the decree was ''in all respects reinstated,'' and thereupon the complainant appealed in error, as before stated.

In the comparatively recent case of Mutual Life Insurance Co. v. Burton, 167 Tenn., 606, at page 613, 72 S. W. (2d), 778, 780, it was held that ''the directed verdict has no place in chancery practice. There is no function it can serve. Whether requested so to do or not, it is the duty of the chancellor to withdraw, or decline to submit to the jury, an issue or 'question' calling for a finding of fact as to which there is in the evidence no dispute or controversy.''

And so, applying to the case in hand the rule stated in 167 Tenn., 606, on page 614 of the opinion just cited, 72 S. W. (2d), 778, when the chancellor determined that complainant's motion for a directed verdict should be granted as to issues numbered 1, 2, and 4, he necessarily found that the evidence relating to the questions of fact stated in these three issues was undisputed and uncontroverted. Having so found, his action in instructing the jury as to how they should answer these questions was literally, as well as in effect, to withdraw these issues from the jury. The directed verdict thus returned was superfluous and nugatory.

The jury found from the evidence, in response to the fifth issue, that Tom Griffis Strong did not state in his application that he had never made an application for any life, accident, or health insurance upon which a policy was issued at an increased rate, or upon which a policy was not issued, or, if issued, was canceled or recalled. This finding was approved by the chancellor and will not be disturbed on appeal if it is supported by any material evidence; but in all other respects the decree was rendered upon facts found by the chancellor from the record and his legal conclusions drawn therefrom, and, on apppeal, will be reviewed as the decree of the chancellor, without regard to the directed verdict of the jury. Mutual Life Insurance Company v. Burton, supra; Carpenter v. Wright, 158 Tenn., 289, 13 S. W. (2d), 51; Hibernia Bank & Trust Co. v. Boyd, 164 Tenn., 376, 48 S. W. (2d), 1084.

Two fundamental propositions underlie the appellant's fifteen assignments of error. These propositions are: (a) That the applicant, Tom Griffis Strong, falsely represented in his application for the policy in controversy that he had not had, or been treated

for, pleurisy, and that this was a misrepresentation of a material matter that increased the risk of loss, and therefore defeated and avoided the policy; and (b) that said applicant for insurance falsely represented in his application that he had never made an application for any life, accident, and health insurance upon which a policy was issued at an increased rate, or limited to a policy different from the one applied for, and that this was a misrepresentation of a material matter that increased the risk of loss and therefore defeated and avoided the policy.

On the other hand, the appellee contends: (a) That the applicant, Strong, did not have pleurisy in January, 1926, within the purview and scope of the question asked; (b) that the only misrepresentation relative to prior applications was an innocent and ignorant misrepresentation that no policy had ever been issued in a form different from that applied for; that this answer was in reply to a technical question calling for expert opinion, and, such being true, that Mr. Strong discharged his full duty when he honestly answered the question, even though such answer did not state the true facts; and (c) that no duty rested upon Mr. Strong, after the receipt of the policy, to call attention to alleged errors in the application which he himself did not realize were errors.

It is our duty to determine which of the above-stated contentions of the parties are suppported by the record.

Many important facts are established by written stipulation of the parties, through their solicitors of record, as follows:

"In this cause, for the purpose of expediting the hearing hereof and the saving of costs, the following stipulation of facts is agreed to.

"I. That the Complainant and Cross-Defendant, Standard Life Insurance Company of the South, is a corporation organized and existing under the laws of the State of Mississippi, with its principal office and place of business at Jackson, Mississippi, and authorized to do and engaged in the business of life, health and accident insurance among other places, in the State of Tennessee, where it has complied with all laws, rules and regulations entitling it to do business therein.

"II. That the Defendant and Cross-Complainant, Floriene A. Strong, widow of Tom Griffis Strong, deceased, is a resident and citizen of Lincoln County, Tennessee, and is the beneficiary named in the insurance policy which is the subject of this litigation, and is now in possession of said policy, and has made demand for payment of the proceeds thereof, and that the policy of insurance filed as Exhibit 'A' to the Cross-Bill is the policy in question.

"III. That Tom Griffis Strong, the deceased husband of the defendant Cross-complainant, on or about January 29th, 1932, made application to the Standard Life Insurance Company of the South

for a policy of life insurance, and that the photostatic copy of said application attached to the original bill filed herein as Exhibit 'A' is a true and correct copy thereof, and may be read and treated in evidence with the same force and effect as the original; that the applicant, Tom Griffis Strong, as shown by said application, agreed among other things, that the statements and answers contained therein, together with those he should make to the Company's medical examiner in continuance of the application, were true and complete and correctly recorded, and that said statements and answers given with the declaration should constitute the application and be the basis of the contract of insurance; that he further agreed on Part II of the application that the answers thereon should be a part of the application which should consist of Parts I and II taken together, and that said answers should become a part of any policy contract that might be issued on the strength thereof; that, pursuant to said application and the representations, and statements contained therein and the payment of the first annual premium thereon, the Complainant and Cross-Defendant, Standard Life Insurance Company of the South, issued to the said Tom Griffis Strong a policy of life insurance, same being No. 5172, which provided among other things, upon due proof of his death and according to its terms and conditions, for the payment of $10,000.00 as the face amount of said policy, to the beneficiary therein named, payable in installments in accordance with the endorsements attached to the policy, said beneficiary being the Defendant and Cross-Complainant, Florienc A. Strong, wife of said applicant, Tom Griffis Strong; that the specimen copy of the form of policy attached to the original bill as Exhibit 'B' is a true and correct copy of the form of policy issued, and that the original thereof is now in the possession of the Defendant and Cross-Complainant, and will be introduced and used in evidence.

"IV. That among other statements and representations contained in said application the following appears as Sub-Section 'B' of Question 7, on Part II thereof, and the answer thereto as given:

"Part II. Question 7. 'Have you ever had or been treated for any disease or disturbance of: (Answer each separately) (B) Lungs, (tuberculosis, pleurisy, pneumonia, asthma.)' Answer 'No.'

"That the following appears as Sub-Section 'D' of Question 2 on Part II of said application, and the answer thereto, respectively:

"Part II. Question 2, 'D': 'Has your application for Life, Accident or Health Insurance ever been declined, postponed, or limited to a policy different from the one applied for, or has any such policy issued to you been cancelled or renewal thereof refused? (State Company and details)' Answer 'No.'

"Part I, Question 14. 'I have never made an application for any life, Accident or Health Insurance upon which a policy was issued

at an increased rate, or upon which a policy was not issued, or if issued, was cancelled or recalled, except: Answer 'No.'

"V. That the said Tom Griffis Strong, on or about November 1st., 1928, made application to the Conservative Life Insurance Company of Wheeling, West Virginia, for a policy of insurance in the principal sum of $5,000.00, the form applied for being a 'multiform' ordinary life policy, with total disability benefits and waiver of premium in the event of total disability to be provided for therein, as hereinafter explained; that the said application to the said Conservative Life Insurance Company, insofar as the type of insurance applied for was declined and in lieu thereof a regular ordinary life policy, same being No. 80758, with extended insurance ruled out and without total disability benefits and waiver of premiums, in the event of total disability, provided for, was approved and issued pursuant to said application; that said policy as issued was rated Table 'A' or up four years, viz., the premium charged thereon was the premium that the applicant would have ordinarily been required to pay had he been four years older than he was at the time he made said application and said policy was issued; that said policy was sent to the agent of said Conservative Life Insurance Company at Fayetteville, Tennessee, for delivery to the said Tom Griffis Strong, and upon inquiry relative thereto some time later, said policy was, on or about January 28th, 1929, returned to said Conservative Life Insurance Company, with the information from said Company's agent at Fayetteville, Tennessee, to the effect that he was not able to deliver same, and requesting its cancellation; that the photostatic copy of the application for a 'multiform' ordinary life policy, made by said Tom Griffis Strong to the said Conservative Life Insurance Company, and pursuant to which said policy of insurance different from the form applied for, as above stated, was issued, attached hereto as Exhibit 'A' is a true and correct copy thereof, as made by said Tom Griffis Strong, with certain alterations and notations as hereinafter shown thereon made in the Medical Department of said Conservative Life Insurance Company at its home office at Wheeling, West Virginia, and may be read in evidence and treated with the same force and effect as the original thereof; said application as sent in was altered and/or modified in the Medical Department in the home office of said Company, as above stated, on page 1 or Part 1 thereof, as follows:

"1. By placing certain notations thereon at top of the page indicating the premium to be charged at the rated age, number and type of policy, date of issuance, etc.

"2. By adding four years to the given age of 44 in reply to Sub-Section 'C' of Question 2, to indicate that the policy was to be issued at a premium rate as of age 44 rather than of age 40, the given age of the applicant.

"3. By ruling out the word 'multiform' given in reply to Sub-Question 'B' of question 7, and substituting in lieu thereof the words 'Ord Life.'

"4. By striking out the checked symbol 'T.D.C. No. 2' and inserting in lieu thereof '$130.45, True prem. $151.25 Rated Prem.,' indicating the premium at true age of 40 and the premium at the rated age of 44.

"5. By striking out the figures given in reply to Question 8 thereon.

"6. By inserting on the margin thereof the following 'Only approved for Reg. Ord. Life with Extended Ins. ruled out, and policy rated Table ''A'' or four years and T.D. not allowed a/c of physical impairments and weight. 1/8/28;' that in all other respects said application is as submitted to said company for the 'multiform' policy as aforesaid, and said alterations, notations, etc., were made on said applications after its receipt at the home office of said Conservative Life Insurance Company because of the fact that it was determined not to issue the policy in the form as applied for but to issue in lieu thereof a different type of policy than the one applied for at a rated age; that a copy of said application altered and modified, as above shown, was attached to said policy No. 80758, as issued to the said Tom Griffis Strong; that the 'Multiform' ordinary life policy, as applied for by said Strong is a specialty of said Conservative Life Insurance Company and the word 'multiform' is in the nature of a trade name; that such form of policy is a five year term nonparticipating policy and carries a term premium rate for five years, with waiver of premiums in the event of total disability provided for therein and after which said term period of five years it is automatically converted to and becomes an ordinary life policy of insurance with the premium approximately the same as for the age when said policy was originally issued as a term policy, such converted insurance carrying a provision therein for total disability benefits and waiver of premium in the event of such total disability; that the premium rate thereon for such policy for the first five years as applied for by the said Tom Griffis Strong was $93.70 per annum, and subsequent to said five-year period of term insurance the annual premium thereon was $144.25; that as above stated said application was declined as to the form of insurance applied for and this was done because of the history of pleurisy given therein by the said Tom Griffis Strong and the further fact that at the time of said application he was underweight and that in lieu thereof, as above stated, a regular ordinary life policy, with extended insurance ruled out, and policy rated Table 'A' or up four years, with total disability benefits and waiver of premiums not allowed, was issued; that the annual premium upon said $5000.00 policy, as issued was $151.25, said policy having been issued as of the

age of 44 years, which made the premium of $20.85 more per annum than it would have been had said policy been issued at the true age of 40 years of the said Tom Griffis Strong. Specimen form copies of the 'multiform' policy as applied for and the ordinary life policy, as issued, are hereto attached as Exhibits 'B' and 'C' respectively, and made a part hereof as fully as if incorporated herein and may be read and treated in evidence with the same force and effect as the originals would be, if introduced.

"VI. That the said Tom Griffis Strong on or about January 29th, 1929, applied to the Kansas City Life Insurance Company of Kansas City, Missouri, for a five years convertible term policy of life insurance in the principal sum of $5000.00; that the annual premium upon said policy as applied for would have been, if issued, $52.05; that however, the said Kansas City Life Insurance Company refused to issue said policy in the form applied for but did issue in lieu thereof to said applicant Tom Griffis Strong, a nonparticipating policy of ordinary life insurance in the principal sum of $2000.00 with an annual premium thereon of $49.84; that the said policy as issued in its modified form was forwarded to the agent of said Kansas City Life Insurance Company at Fayetteville, Tennessee, for delivery to the said Tom Griffis Strong, and that in due course the net premium thereon due the Company for the first year's insurance was remitted by said agent to the general agent of said Company at Nashville, Tennessee; that a photostatic copy of said application to the Kansas City Life Insurance Company attached hereto as Exhibit 'D' is a full, true and correct copy thereof, as made by the said Strong to said Company, and the photostatic copy of the policy as issued to said Tom Griffis Strong, pursuant to said application and in lieu of the one as applied for, is a full, true and correct copy of said policy, and both may be read in evidence and treated with the same force and effect as the original thereof would be, if produced; that said application was declined as to the form of policy applied for because of the low blood pressure of the said Tom Griffis Strong and the fact that he was under weight; as disclosed by his medical examination therefor.

"VII. That the said Tom Griffis Strong died on or about April 7, 1932, in Fayetteville, Lincoln County, Tennessee, and proofs of his death were filed in due course with Complainant and Cross-Defendant and demand for payment made; and that the photostatic copy of the death certificate filed with the Bureau of Vital Statistics of the State of Tennessee, and attached hereto as Exhibit 'E' is a full, true and correct copy of the death certificate of the said Tom Griffis Strong, as filed in said Bureau of Vital Statistics and may be read and treated in evidence with the same force and effect as the original.

"VIII. That legal tender of the premium of $278.80 with legal

interest thereon from the date of said payment by the said Tom Griffis Strong on or about February 23, 1932, to the Complainant and. Cross-Defendant was made to the Defendant and Cross-Complainant, or her representatives, by said Complainant and Cross-Defendant prior to the filing of the original bill in this cause and same was refused and said sum was paid to the Clerk & Master of the Chancery Court at Fayetteville, Tennessee, contemporaneously with the filing of the original bill herein for the use and benefit of the Defendant and Cross-Complainant and/or the administrator or executor of the estate of the said Tom Griffis Strong.

"IX. That said bill as filed by the Complainant and Cross-Defendant seeking a rescission and cancellation of said policy was filed within the incontestable period provided for in said policy.

"X. That proofs of death were made out in proper form and in due time forwarded to the complainant and cross-defendant, Standard Life Insurance Company of the South, and demand for payment of said policy in full, according to its terms was duly and properly made and receipt of said proofs of death, etc., was acknowledged by said Insurance Company by letter under date of April 27, 1932. A photostatic copy of said proofs is hereto attached as Exhibit 'F.'

"XI. It is further stipulated between the parties hereto that while the matters as above set out are stipulated to be facts, that nothing in this stipulation shall be considered or construed as admitting the materiality, relevancy and/or competency of any of the facts herein stipulated to and either party reserves and shall have the right to except to any such fact or facts as being irrelevant and/or immaterial insofar as any issues in this cause are involved.

"XII. Nothing herein shall be considered or construed as precluding either and/or both of the parties hereto from introducing other and/or additional facts in evidence, but such right is specifically reserved to either and/or both parties subject, always, to the exception of the opposite party for irrelevancy, incompetency, immateriality, etc."

Witnesses on behalf of each of the parties were examined orally before the court and jury below, and we will later refer more particularly to some of the salient features of this testimony.

1. The chancellor found, and instructed the jury, that it appeared from the undisputed proof that the applicant, Tom Griffis Strong, had, and had been treated for, pleurisy prior to the date of the application for the policy of insurance in question; and in this finding we concur.

Notwithstanding this finding, the learned chancellor held, in his written opinion on final hearing, that the policy in question was not thereby avoided, basing this latter conclusion upon an asserted distinction between "primary pleurisy" and "secondary pleurisy."

On this point, the chancellor said:

"The disease of pleurisy in its strict sense would be such a disease as would increase the hazard, and the information sought in question four (seven) is such as might cause the insurer to decline such insurance as the peculiar effect incident thereto might disclose.

"The question raised by defendant's counsel regarding the disease known as pleurisy and its contemplation as embraced in question No. 1 was pleurisy in its primary state and not in its secondary form. Referring to the medical journals this disease is thus classified,— primary pleurisy and secondary pleurisy. The first class is pleurisy proper and second class simply an inflammation of the pleura in sympathy with some other organ disease or as an accompaniment to same. Supporting this contention see Sir William Osler's Work on Practicing Medicine, Tice's Practice of Medicine, Vol. 5, page 579. In the latter authority this definition and distinction is made and drawn:

"A 'primary' pleurisy is one the symptoms of which interrupt *a period of apparent good health,* or one which seems to *precede or cause or lead up to* a later lesion. In these senses a pleurisy may be as primary as a pneumonia.

" 'Secondary' pleurisy indicates clinically that the symptoms of involvement of the pleura *follow and combine with or supersede* the symptoms of involvement of another organ.''

"The attending physician, Dr. Patrick, states the malady of the disease for which the patient was treated was influenza, commonly known as 'flu,' and after suffering for several days with this disease, secondary pleurisy arose which lasted only a few days. The deceased, according to this doctor's statement, had an attack of flu in his last illness accompanied by secondary pleurisy and finally died of pneumonia. It is, therefore, the insistence of defendant, Mrs. Strong, that answer to question No. 1 was true and there was no misrepresentation or concealment of any fact in his answer to said question. In other words, the deceased had never been afflicted with the disease known as pleurisy, but in his answers to some of the questions he stated that he had 'flu,' and that secondary pleurisy could in no contemplation, either of fact, or law, be termed primary pleurisy as intended by question No. 1. This question, insofar as the research of the Court is concerned, seems of first impression in this State, and in order to give the question proper consideration it is deemed advisable to refer to the authorities of other States, together with the medical authorities heretofore referred to, in order to determine the rationale of the proposition raised by defendant's counsel.''

The opinion here quotes at some length from the cases of Price v. Phoenix Mutual Life Insurance Co., 17 Minn., 497 (Gil., 473), 10 Am. Rep., 166, 181, and Billings v. Metropolitan Life Insurance Co., 70 Vt., 477, 41 A., 516, to which we will refer later, and then proceeds as follows:

"It will be noted that the cases referred to make a marked distinction between the primary disease and the secondary disease, and if the question is propounded to an applicant calling for an answer to the primary disease, and in fact he has had the secondary disease, his answer thereto 'No' is true and there rests no grounds for the rescission or cancellation of said policy because he had had the secondary disease and such answer amounted to no misrepresentation or concealment. The attending physician pronounced his primary disease as 'flu' in the instant case and shortly thereafter there followed the secondary disease of pleurisy, which in all respects brings the case at bar wholly within the holding pronounced by the two cases referred to. If the question No. 1 and the answer thereto contemplated any kind of pleurisy, then, of course, under our authority unnecessary here to refer will estop a recovery and complainant would be entitled to recovery on its original bill. But relying upon the medical authorities and the two cases referred to, for the reasons therein given, the Court must conclude in accord with said cases and find that the answer to question 1 was true and in no way concealed or misrepresented the facts in said application."

The learned counsel for appellee seeks to support the opinion of the chancellor above quoted mainly upon the same authorities cited by the chancellor.

The witness, Dr. Chas. F. McKenzie, chief medical examiner for complainant, defined pleurisy and its "effect on a man's system" as follows:

"Inflammation of the outside lining or bag which contains the lungs. It is inflammation of the pleura which is the outside covering of the lungs, impairing the lungs. In some cases it may seem to pass off but the impairment of the lungs is always left there. I don't mean active disease, but it is so impaired that later on on account of lack of resistance any lung trouble may set up, sometimes is very serious. In other words, it weakens his power of resistance."

The testimony of Dr. McKenzie above quoted is undisputed, and the testimony of two other medical witnesses is to the same effect.

It also appears from the record, without dispute, that the fact that an applicant for life insurance has had pleurisy within a period of seven or eight years prior to his application is a material matter that tends to increase the risk, and that this is especially true when the applicant is "under weight." The proof is that Tom Griffis Strong was nearly 30 pounds under weight at the time he applied to complainant for the policy in question.

Dr. T. A. Patrick, a graduate physician with twenty-four years' experience in the practice of medicine and "additional work" in the clinics of four nationally known hospitals, testified that he was the "family physician" of Tom Griffis Strong and attended him in January, 1926, as such.

If the theory urged on behalf of defendant, and adopted by the chancellor, that the "pleurisy" which Tom Griffis Strong admittedly had in January, 1926, was not pleurisy "within the purview and scope of the question asked" in the application, is supported by any evidence in the record, such support must be found in the testimony of Dr. Patrick. We therefore quote the remainder of Dr. Patrick's testimony in full, which is as follows:

"Q. What was his trouble? A. He had influenza complicated with pleurisy.

"Q. Now, how long after he had the influenza before the pleurisy came up? A. Just a few days, the pleurisy only lasted a few days.

"Q. Doctor, how did you diagnose his case. I mean by that what did you pronounce his disease? A. Flu, influenza.

"Q. As I catch you, influenza was the real trouble and this pleurisy was simply a state—

"(If the Court please the Doctor has stated he had pleurisy with influenza—Mr. Peebles, Atty.)

"A. It was complicated with pleurisy.

"Q. You just put it down on common, every day talk. If anybody met you and asked you what was the matter with Tom Strong, what would you have told them?

"(The Doctor has testified he had flu with complications of pleurisy and he referred to having pleurisy—Mr. Peebles, Atty.)

"(He is trying to get the witness to explain—Judge Lytle)

"(He is trying to get the witness to say what he would have stated to them—Mr. Peebles, Atty.)

"(Your Honor here is what I am trying to get at, simply to get clear. If I have the fever the fever is the trouble with me, even if I talk foolish—Mr. Lamb, Atty.)

"Q. Then he had influenza did he Doctor? A. Yes, sir."

Cross-examination by J. M. Peebles, attorney:

"Q. He had pleurisy along with it? A. Yes, sir, complications.

"Q. Doctor, I believe you made out the death proof of Mr. Strong? A. Yes, sir.

"Q. Here is a certified copy of it, if you want to look at it to refresh your recollection. What was the cause of his death? A. Flu pneumonia with complication of pleurisy.

"Q. That complication was the same trouble he had before and it killed him this time? A. Anybody will have pleurisy with flu where the inflammation involves portion of the lungs where it attaches to the pleura.

"Q. He had the same thing that he died with back yonder, except in a more severe form? A. Yes, sir, pneumonia killed him.

"Q. It started with the flu and pleurisy? A. Flu and pneumonia and had pleurisy complications.

"Q. You made out proof of death for Mrs. Strong for the Stand-

ard Life Insurance Company of the South, you made it all out for Mrs. Strong: This photostatic copy that has been introduced in the evidence to be used in the same force and effect as the original, that is your signature? A. Yes, sir.

"Q. You made out that proof? A. Yes, sir.

"Q. On that proof you gave he had flu and pleurisy about 1928? A. I said about, I did not go to the records and see.

"Q. At that time you were of the opinion that he had the flu and pleurisy about 1928, which you discovered was 1926? A. I did not go to my records to look it up.

"Q. In other words, he had it only one time? Do you still stick to the diagnosis you put on here that he had flu and pleurisy in 1926 and not 1928? A. Yes, sir."

Redirect examination by W. B. Lamb, Jr., attorney:

"Q. Doctor, a man can just have a straight attack of pleurisy? A. Yes, sir."

Recross-examination by J. M. Peebles, attorney:

"Q. And then he can have pleurisy development with some other disease? A. Yes, sir.

"Q. That is what you diagnose? A. Yes, sir.

"Q. Did he know he had pleurisy, did you tell him he had pleurisy or flu? A. He knew he had flu. I don't remember whether I told him he had pleurisy or not.

"Q. Assuming Mr. Strong made an application for life insurance in 1928 in which it said he had pleurisy about 1925?

"(That is a hypothetical question—Mr. Lamb, Atty.)

"(What I am trying to find out is what was in the applicant's mind when he said he did not have pleurisy—Mr. Peebles, Attorney.)

"(He said he told him he had the flu—Mr. Lamb, Atty.)

"Q. Doctor, do you know whether or not you told him he had pleurisy? A. I don't remember about that."

Re-direct examination by W. B. Lamb, Jr., attorney:

"Q. But you know you did tell him he had flu? A. Yes, sir.

"Q. Doctor from that time in the early part of 1926 up until Mr. Strong was seized with his fatal illness did he ever have any disease so far as you know?

"(We except to that as immaterial—Mr. Peebles, Atty.)

"(What is material to that, Mr. Lamb—Mr. Peebles, Atty.)

"(His bill charged that he had flu in 1925 or 1926 or 1928—Mr. Lamb, Atty.)

"(If the Court please I have withdrawn that—Mr. Peebles, Atty.)

"(Objection sustained.)

"(I will make this explanation to the Court that Mr. Strong on his application for life insurance to the Conservative Life said he had pleurisy about 1925 and the Doctor in the proof of death said he had it about 1928 and for that reason it was charged in the bill

that he had it twice and they both refer to pleurisy in 1926—Peebles, Atty.)''

In the proofs of death of Tom Griffis Strong, prepared and signed by Dr. Patrick, he stated that he had treated the deceased for ''flu and pleurisy'' in 1928. As we have seen, in his testimony at the trial, Dr. Patrick corrected the date, saying it was January, 1926, but stated that he would ''still stick to the diagnosis'' on the proofs of death that he had ''flu and pleurisy in 1926 and not in 1928.'' Elsewhere in his testimony Dr. Patrick characterized the illness of Tom Griffis Strong in January, 1926, as ''influenza complicated with pleurisy,'' and stated that ''a man can just have a straight attack of pleurisy'' or ''he can have pleurisy development with some other disease,'' and that ''anybody will have pleurisy with flu where the inflammation involves portions of the lungs where it attaches to the pleura.''

In his aforementioned application to the Conservative Life Insurance Company, Tom Griffis Strong enumerated ''pleurisy'' as one of the causes for which he had consulted a physician in the last ten years, and he named ''T. A. Patrick, Fayetteville,'' as his ''attending Physician.'' The medical witnesses who testified that the fact that an applicant for insurance has had pleurisy is material to the risk (that such an attack of pleurisy leaves the victim in a condition which increases the risk of loss) made no distinction between primary pleurisy and secondary pleurisy. We are persuaded that the distinction relates more especially to the origin or cause of the disease, rather than to its effects. In fact, the terms ''primary pleurisy'' and ''secondary pleurisy'' do not appear in the evidence in this case, but are used by the learned chancellor in his opinion, wherein he states that pleurisy is thus classified in the ''medical journals.''

The aforementioned case of Price v. Phoenix Mutual Life Insurance Co., 17 Minn., 497 (Gil., 473), 10 Am. Rep., 166, cited by the chancellor and in defendant's brief, was an action brought by the beneficiaries to recover upon a life insurance policy. The main defense offered was that the insured made untrue answers to certain specified questions in his application for insurance. The case was tried to a jury, and the verdict and judgment were for the plaintiffs. One of the numerous questions raised on the appeal was that the court erred in refusing to instruct the jury, upon the request of the defendant insurance company, ''that the plaintiffs are not entitled to recover in this action, but the verdict must be for the defendant.'' The court held that the trial court did not err in refusing to give such peremptory instruction to the jury, but the judgment was reversed and the cause remanded for a new trial for other reasons stated. That part of the opinion in said case quoted by the chancellor is as follows:

"The 13th question was: 'Has the party ever had any of the following diseases (naming several, and among others) rheumatism?'' 'Answer—never.' There was evidence in this case tending to show that the life insured had had sub-acute rheumatism. There was also evidence in the case tending to show that sub-acute rheumatism is not the *disease* of rheumatism, in the ordinary understanding of the term. There was also evidence tending to show that, technically, and in medical parlance, sub-acute rheumatism is the disease of rheumatism. Dr. Willey swears that it is generally overlooked as a disease, and there is other testimony to the same effect.

"The rheumatism referred to in the question is the *disease* of rheumatism. Any rheumatic affection not amounting to the *disease* of rheumatism, is not comprehended in its terms, any more than the spitting of blood occasioned by a wound of the tongue, or the extracting of a tooth, is the *disease* of 'spitting of blood' mentioned in the same question. The life insured had the right to answer the question upon the basis that its terms were used in their ordinary signification. If there was any ambiguity in the question so that its language was capable of being construed in an ordinary, as well as in a technical sense, the defendant can take no advantage from such ambiguity. Wilson v. Hampden F. I. Co., 4 R. I., 159; Flanders on Insurance, 225. As to this question, then, we cannot say that the verdict was not supported by the evidence."

The case of Billings v. Metropolitan Life Insurance Co., 70 Vt., 477, 41 A., 516, 517, also cited by the Chancellor and in defendant's brief, was likewise an action by the beneficiary of a life insurance policy to recover on a policy. One of the defenses urged by the insurance company was that the insured had falsely stated in his application that he had never had bronchitis. There was a jury verdict, and judgment thereon, for the plaintiff, and this judgment was affirmed on appeal. That part of the court's opinion on which the present defendant relies, including the portion quoted by the chancellor, is as follows:

"On trial, the defendant disavowed any claim on its part to defeat the policy on the ground of fraud, and in respect to matters in the application which it claimed to be untrue relied upon said warranty therein contained.

"The application contained, among others, the following questions and answers:

" 'Q. Have you ever had bronchitis? A. No.'

" 'Q. 3. Give full particulars of any illness you may have had since childhood, and name of medical attendant or attendants. A Measles, 8 years ago. Dr. Fox.'

" 'Q. 6A. Name and residence of your usual medical attendant. A. Have none.

" 'B. When and for what have his services been required? A.

. . . Q. 7. Have you consulted any other physician? If so, when, and for what? A. See No. 3.'

"The defendant claimed in its pleadings and upon trial that before the application the insured had had bronchitis, and illnesses other than measles, and that he had consulted and been treated by physicians other than Dr. Fox, and that the answers to the question respecting bronchitis and to questions 3, 6, 7 were untrue, and on this ground also moved the court below to direct a verdict for it, and excepted to the denial of this motion.

"The date of the application was May 15, 1894, and the date of the policy was May 31, 1894.

"The testimony of Dr. Constans tended to show that he, at his office, prescribed for the insured in May, 1893, for 'gastric trouble (acute gastritis),' and in November, 1893, 'for bronchial cold (acute bronchial trouble at that time; a slight cold);' that the gastric trouble in May, 1893, was not of a serious nature, but only a slight indisposition; that the term 'acute bronchitis' means an ordinary cold in the chest, and that the bronchial cold for which he prescribed for the insured in November, 1893, was an ordinary cold, not of a serious nature, and such as a person might ordinarily have, and get rid of easily. The testimony of Dr. A. V. Lyon, introduced by the defendant, tended to show that in May and June, 1892, he treated the insured for a grip cold and its results, and in August, 1892, for a cold with hoarseness, but that he was not sick in bed at any of the dates mentioned. The testimony of Dr. Fox, a witness produced by the defendant, tended to prove that he attended the insured in June and July, 1885, when he found him suffering from measles, which had developed an acute bronchitis; and that acute bronchitis, more or less pronounced, usually accompanies the measles. The testimony of Mary A. Billings, a witness introduced by the plaintiff, tended to show that when a boy between 14 and 15 years old, and living at home, and prior to May, 1894, the insured was sick a few days, but sick in bed only the first day, and during this sickness was visited once or twice by Dr. Crowley. This is substantially the evidence on which defendant relies in support of this motion.

"The evidence on the part of the plaintiff tended to prove that it was a misnomer to call an ordinary cold, or a grip cold, or the so-called acute bronchitis said to accompany measles, bronchitis; that bronchitis, as known to the medical profession, was a different disease from any of the ailments for which Drs. Constans, Lyons, and Fox claimed to have treated the insured; that the acute bronchitis described by Dr. Fox was a part of the measles, and an ordinary accompaniment thereof; that, with the exception of the measles, the ailments for which it was claimed the insured had been treated prior to the date of the policy were not diseases nor illness. This clearly

raised the issue of fact whether the insured, at the date of his application, had bronchitis or not. This issue was properly submitted to the jury, which found against the defendant."

It is seen that in the case of Price v. Phoenix Mutual Life Insurance Company, supra, the insured stated in his application that he had never had the disease of rheumatism. There was evidence tending to show that he had had "sub-acute rheumatism" and that "sub-acute rheumatism" is not the *disease* of "rheumatism." On the other hand, there was evidence tending to show that "sub-acute rheumatism" is the *disease* of "rheumatism." On this *conflicting* evidence the jury found that "sub-acute rheumatism" is not the disease of "rheumatism;" hence it followed necessarily that the statement of the insured in his application, that he had never had the disease of rheumatism, was true.

The case of Billings v. Metropolitan Life Insurance Company was likewise tried by a jury on conflicting evidence. On the one hand the testimony of Dr. Fox "tended to prove that he attended the insured in June and July, 1885, when he found him suffering from measles, which had developed an acute bronchitis; and that acute bronchitis, more or less pronounced, usually accompanies the measles." On the other hand, there was evidence which "tended to prove that it was a misnomer to call an ordinary cold or a grip cold, or the so-called acute bronchitis said to accompany measles, bronchitis; that bronchitis, as known to the medical profession, was a different disease from any of the ailments for which Doctors Constans, Lyons, and Fox claimed to have treated the insured; that the acute bronchitis described by Dr. Fox was a part of the measles, and an ordinary accompaniment thereof; that, with the exception of the measles, the ailments for which it was claimed the insured had been treated prior to the date of the policy were not diseases nor illness." In this situation, the court said: "This clearly raised the issue of fact whether the insured, at the date of his application, had bronchitis or not. This issue was properly submitted to the jury, which found against the defendant."

In the instant case, there is no evidence that "secondary pleurisy" is not the disease of pleurisy, or that pleurisy combined with influenza is not pleurisy with all the serious consequences which may follow primary pleurisy. According to this record, an attack of pleurisy will tend to impair the lungs, undermine the constitution, and weaken the patient's power of resistance to the onset of other diseases; and, in this respect, so far as appears, there is no difference between pleurisy caused directly by microbial infection and pleurisy caused by extension to the pleura of inflammation from other organs.

■ Some excerpts from medical text-books are quoted as authority in the chancellor's opinion and in defendant's brief. These text-books were not in evidence below, and, if offered, would not have been competent evidence. Note, 19 Annotated Cas., p. 1002.

"According to the clear weight of present authority, scientific books and treatises cannot be received as evidence of the matters or opinions which they contain." Jones on Evidence (2 Ed.), vol. 4, sec. 1741, p. 3189.

If such books are not competent evidence, it follows, a fortiori, that the court cannot take judicial knowledge of·their contents.

"Facts which are universally known, and which may be found in encyclopedias, dictionaries or other publications, are judicially noticed, provided they are of such universal notoriety and so generally understood that they may be regarded as forming part of the common knowledge of every person." Jones on Evidence (2 Ed.), vol. 1, sec. 450, p. 799.

But this rule does not ordinarily extend to the pathology of disease. Issues involving this subject are to be determined upon the testimony of qualified expert medical witnesses. American National Insurance Co. v. Smith, 18 Tenn. App., 222, 74 S. W. (2d), 1078. See, also, numerous cases cited in Jones on Evidence (2 Ed.), vol. 1, p. 812, footnote 8.

However, we have discovered nothing in the aforesaid quotations from medical text-books which run counter to the views which we have expressed herein.

If an application for life insurance contains false representations which "increase the risk of loss," such misrepresentations will be deemed material, and will "defeat or void the policy or prevent its attaching," whether made "with actual intent to deceive" or not. When it has been determined that the answers of the applicant were untrue, it becomes a question of law for the court as to whether such misrepresentations constitute matter increasing the risk of loss; and a misrepresentation about any matter of sufficient importance, in the opinion of the court, to naturally and reasonably influence the judgment of the insurer in making the contract, is a misrepresentation that "increases the risk of loss" within the meaning of section 6126 of the Code. Mutual Life Insurance Co. v. Dibrell, 137 Tenn., 528, 529, 194 S. W., 581, L. R. A., 1917E, 554; Volunteer State Life Insurance Co. v. Richardson, 146 Tenn., 589, 244 S. W., 44, 26 A. L. R., 1270; Hughes Brothers v. Aetna Insurance Co., 148 Tenn., 293, 301, 25 S. W., 363, 366; National Life & Accident Insurance Co. v. American Trust Co., 17 Tenn. App., 516, 542, 545, 68 S. W. (2d), 971; Robbins v. New York Life Insurance Co., 18 Tenn. App., 70, 72 S. W. (2d), 788, 793.

We are of the opinion that the fact that Tom Griffis Strong had had pleurisy as shown by the proof, approximately six years prior to his application for the insurance here in controversy, which was misrepresented in his application, would "increase the risk of loss," and such misrepresentation was naturally and reasonably calculated to affect the insurer's judgment in determining whether

or not to issue the policy. The appellant's fifth, sixth, seventh, eighth, ninth, twelfth and thirteenth assignments of error are sustained.

2. As before stated, the second proposition on which appellant relies is that Tom Griffis Strong falsely represented in his application for the policy in question that he had never made an application for any life, accident, or health insurance upon which a policy was issued at an increased rate, or limited to a policy different from the one applied for, and that this was a misrepresentation of a material matter that increased the risk of loss and therefore defeated and avoided the policy.

In the preparation of the said application of said Tom Griffis Strong to complainant, Dr. Hardin, medical examiner, asked the applicant the following question:

"Has your application for life, accident or health insurance ever been declined, postponed, or limited to a policy different from the one applied for, or has any such policy issued to you been cancelled or renewal thereof refused? (State company and details.)"

This appears from undisputed proof, and the jury so found in obedience to a peremptory instruction by the chancellor. To said question the applicant answered, "No."

Question 14 of part I and the answer of the applicant thereto, as they appear in the application, are as follows:

"I have never made an application for life, accident or health insurance upon which a policy was issued at an increased rate, or upon which a policy was not issued, or if issued, was cancelled or recalled, except:" "No."

The fifth issue submitted to the jury and the response of the jury thereto were as follows:

"Did Tom Strong make the following statement in his application: 14 'I have never made an application for life, accident or health insurance upon which a policy was issued at an increased rate, or upon which a policy was not issued, or if issued, was cancelled or recalled?' " Answer "No."

It is seen from the agreed stipulation of facts filed in the cause, which we have hereinbefore copied in full, that an application for a described policy of insurance was made by Tom Griffis Strong to the Conservative Life Insurance Company, of Wheeling, W. Va., on November 1, 1928, and that the policy thus applied for was not issued, but the policy was limited to a policy materially different from the one applied for and at a higher rate of premium "because of the history of pleurisy given and underweight shown."

It further appears from the aforesaid stipulation of facts that an application for a described policy of life insurance for $5,000 was made by Tom Griffis Strong to the Kansas City Life Insurance Company of Kansas City, on or about January 29, 1929, and that the

policy applied for was not issued, but the policy was limited to a policy for $2,000 materially different from the one applied for. It thus appears, without dispute, that the aforesaid statement of the applicant, in response to the question by Dr. Hardin, that his application for life, health, or accident insurance had never been "limited to a policy different from the one applied for," was untrue in point of fact.

If Tom Griffis Strong made the statement in said application to complainant that he had never made an application for life, accident, or health insurance upon which a policy was issued at an increased rate, as appears from question 14, part I, of the application, and the applicant's answer thereto, such statement was likewise untrue.

However, the jury found, in response to issue No. 5, that the applicant, Tom Griffis Strong, did not make this latter statement.

But the appellant asserts, through its third assignment of error, that there is no material evidence to support the verdict of the jury on issue No. 5, and, through its second assignment of error, that the court erred in failing and refusing to sustain the motion of the insurance company, made at the conclusion of all the proof, to peremptorily instruct the jury to respond to issue No. 5 in the affirmative, viz., favorable to the contentions of the complainant insurance company.

It is proper, therefore, to examine the record in order to ascertain whether or not there is any material evidence to support the finding of the jury on issue No. 5.

There is a presumption that the person signing an application for insurance authorized the statements made therein and had knowledge of the contents of the application. Couch on Insurance, vol. 8, sec. 2171, p. 7027.

The defendant below sought to overcome the presumption just mentioned by the testimony of A. S. Hutchinson. There is no other evidence on this point in the record.

The witness Hutchinson stated that he lives in Fayetteville; that he is an "insurance man" and has been in the insurance business approximately thirteen years; that he knew Tom Griffis Strong and had known him about ten years.

The witness was then shown the application attached to and made a part of the policy involved in this case, and he stated that he "filled out that application." His attention was then directed to two questions, one being the question on which issue No. 4 was based and the other being question 14, part I, on which issue No. 5 was based, and, after the witness had stated that the first mentioned of the two questions was "filled out" by Dr. Hardin and not by witness, the remainder of the testimony of the witness was as follows:

"Q. We will stick to that 14. Did you read also that question

I called your attention to? A. I did not read it to him in full, but I asked him if he was ever rejected for insurance.

"Q. Did you ask him whether he had ever been rated up or policy issued in a different form for a different term or did you just ask in a general way as to whether he had been rejected? Just state how it was. A. I asked Mr. Strong if he had ever been rejected for insurance and I don't remember of asking him if he had ever been rated up, but I usually always in filling out applications ask applicant if he has been rejected, because there is no need going any further with the application if he has.

"Q. What I am trying to get at is whether you or not asked him if he had ever been postponed or limited to a policy different from the one applied for? (Question objected to and objection overruled by the Court.) A. I don't remember of asking Mr. Strong the question in full.

"Q. Did you or not? A. I could not say, Mr. Lamb. (Question objected to and objection overruled by the Court.)

"Q. What is your best recollection? A. I asked him if he had ever been declined and he said 'No.'

"Q. That was all you asked him? A. Yes, sir."

Cross-examination by J. M. Peebles, attorney:

"Q. Mr. Hutchinson, as I understood you—it may be I misunderstood you. As I understood you, you said you do not recall whether you asked him whether or not he had been declined, is that correct? A. Yes, sir, to the best of my knowledge.

"Q. You don't say you did not ask him the other things contained in that question? · A. I don't remember asking the question in full.

"Q. You don't remember whether you did or not? A. No, sir.

"Q. That is all you are trying to testify? A. Yes, sir.

"Q. You know you asked him whether or not he had been rejected, but you don't recall about the other things, that is a fact? A. Yes, sir.

"Q. This application was taken on what date? A. It appears the 29th day of January, 1932.

"Q. Let's see on May 11th, 1932, that was how long after this application was taken, from January to May, a little less than four months? A. Yes, sir, a little less than four months.

"Q. Do you think your mind would have been fresher in May, 1932, as to what took place than now? A. · I don't know as it would have.

"Q. It was clearer at the time. I hand you herewith a statement and will ask you if you signed that and swore to it before a Notary Public, is that your signature? A. Yes, sir, that is my signature.

"Q. I will read this to the Jury: 'This is to certify that I, A. S. Hutchinson, agent for the Standard Life Insurance Company

of Jackson, Mississippi, did secure an application from Tom Griffis Strong of Fayetteville, Tennessee, for life insurance in the Standard Life Insurance Company; and in so doing did set down in my own handwriting the answers to each and every question on the Company Application form as they were made to me by Tom Griffis Strong in response to my inquiry regarding each of the questions; and that a policy was issued as a result of the application. Signed A. S. Hutchinson. Subscribed and sworn to before me this the 11th day of May, 1932. Mrs. W. J. Stubblefield, Notary Public. My commission expires April 7, 1936,'

"I want you to file that as Exhibit 'A' to your cross-examination. A. Yes, sir, I am trying to state the facts in all cases.

"Q. You were giving the facts in May for an application taken the latter part of January? A. Yes, sir.

"Q. Now, you file that as Exhibit 'A' to your cross-examination? You were stating facts in May as you recalled them when you made that affidavit? A. Yes, sir.

"Q. You don't say the facts are not true now? A. They are true to the best of my knowledge."

It is seen that, although Mr. Hutchinson states in his direct examination that his "best recollection" is that all he asked Mr. Strong was "if he had ever been declined, and he said 'No.'" He also states in his direct examination that he "don't remember of asking Mr. Strong the question in full" and that he could not say whether he did or not.

On cross-examination Mr. Hutchinson states that all he is trying to testify is that he knows he asked Mr. Strong whether or not he had been rejected, but he did not remember whether he asked the question (No. 14) in full or not. In order to ascertain the facts to which the witness testifies, the whole of his evidence must be considered, and not merely isolated statements therein. Johnston v. C., N. O. & T. P. Railway Co., 146 Tenn., 135, 159, 240 S. W., 429.

"The appellate court does not weigh evidence in a cause tried to a jury, according to its preponderance, but it must and does determine whether or not the evidence relied on to support the verdict is substantial in itself—has fitness to induce conviction." American National Insurance Co. v. Smith, supra, 18 Tenn. App., 222, 74 S. W. (2d), 1078, 1081.

The statement of Mr. Hutchinson, several times repeated in his testimony, that he did not remember whether or not he asked Mr. Strong the question in full, certainly does not "induce conviction" in the mind of the court that the witness did not ask Mr. Strong question No. 14 "in full," and his testimony affords no support for the finding of the jury on issue No. 5. Appellant's second and third assignments of error are therefore sustained, with the qualification that, as a matter of procedure, the chancellor should have

withdrawn the fifth issue from the jury, rather than direct a verdict of the jury thereon, as asserted in appellant's second assignment of error. Mutual Life Insurance Co. v. Burton, supra.

It is contended for defendant that the policies issued by the Conservative Life Insurance Company and the Kansas City Life Insurance Company were never delivered to T. G. Strong, and that he did not know of their issuance. L. E. Cowden was the local agent at Fayetteville through whom each of the last-named applications were transmitted to the respective insurance companies. The witness Arch Caughran, working as a solicitor for Cowden, had some part in obtaining Strong's application for the Conservative Life policy, but stated that he did not remember the Kansas City policy. Caughran testified that, when the Conservative Life policy came and he saw that it was a different policy from that applied for and at so much higher premium, he told Cowden that he could not deliver it, and that Cowden returned it to the insurance company, and witness did not tell Mr. Strong about it.

L. E. Cowden testified, on direct examination, that he never delivered either the Conservative Life or the Kansas City policy to Mr. Strong, and never told Strong that he (Cowden) had received these policies, and that he did not "give Strong any information about them being rated up or anything of that sort."

But, with reference to the Kansas City policy, it was stipulated of record "that said policy as issued in its modified form was forwarded to the agent of the Kansas City Life Insurance Company for delivery to said Strong, and in due course the net premium thereon due the Company for the first year's insurance was remitted to the general agent of the Company at Nashville, Tennessee;" and, with respect to the significance of the fact of the payment of the premium, we quote from the cross-examination of Cowden as follows:

"Q. When you say Mr. Caughran came back and told you so and so about the Kansas City Life and the Conservative Life, you mean he told you about the Conservative Life? A. He told me about both. When he came to me he told me, 'We can't deliver either one of the policies.'

"Q. You recall that now? A. Yes, to be sure I recall it.

"Q. If he came to you and told you 'We can't deliver the Kansas City Life,' why didn't you cancel the policy instead of sending in the premium to the Company? A. He might have delivered it after that and told me to pay the premium, I don't remember.

"Q. If he told you that the premiums were charged against you, that part going to the company, if he told you 'We can't deliver them,' why did you send the premium in? A. Because he had to deliver, he went ahead and delivered afterward. If I send the premiums in it was bound to be delivered.

"Q. You know you send the premium in, you did send the pre-

mium in on this policy Kansas City Life? A. I can't tell you whether I did or not.

"Q. Didn't you look it up last spring and make that statement? A. I may have last spring. If I sent the premium in it was delivered.

"Q. If you sent the premium in it was delivered? A. To be sure it was. If I sent the premium in the policy was delivered, I turned it over to Mr. Caughran and he delivered it.

"Q. If you sent the premium in? Have you got any records in your office which will show whether or not you paid this premium? A. No, I have not.

"Q. You don't recall now looking it up last spring, your communication with the Kansas City Life and finding out that you had paid it? A. I think I did.

"Q. You took it up with the Kansas City Life and found you paid the premium on this Policy? A. Yes, sir.

"Q. If you paid the premium on the policy, the policy was delivered, wasn't it? A. Yes, sir, but I did not deliver the policy.

"Q. You would not have paid the premium unless you had had information it had been delivered? You are not a rich man? A. I know he did deliver it.

"Q. You would not have paid the premium if you had been advised 'This policy is not going to be delivered,' you would not have paid the premium, would you? A. No, sir."

It would have been contrary to the known habits and common experience of men in similar situations, and the ordinary course of business affairs for Mr. Strong to have permitted more than three years to elapse after he had applied for two $5,000 policies of insurance on his life without ascertaining what disposition the insurance companies had made of his applications, and, in the absence of proof to the contrary, such knowledge on his part would be presumed. Moore on Facts, vol. 1, sec. 174, p. 221 et seq.

Upon a careful examination and consideration of the entire testimony of the witnesses Cowden and Caughran, we find that their testimony does not prove that Tom Griffis Strong did not know, at the time he applied to complainant for the policy in question, that the Conservative Life Insurance Company and the Kansas City Life Insurance Company had declined to issue policies for which he had applied to them, respectively, but had issued policies materially different from those applied for, and at a higher rate of premium.

It was the duty of Mr. Strong to disclose the facts with reference to these matters in response to the questions in the application and his answers to the two questions now brought under consideration amounted to misrepresentations as to facts, not mere matters of opinion, which, the proof shows, were material to the risk and naturally and reasonably influenced the judgment of the insurer.

We are of the opinion that the instant case falls within the ruling in Mutual Life Insurance Co. v. Dibrell, supra, notwithstanding the very ingenious and persuasive argument by which the able and learned counsel for the defendant attempts to distinguish the two cases. The main questions we have discussed under this, the second, subdivision of this opinion are raised by the appellant's tenth and eleventh assignments of error and these assignments are sustained.

3. It results that the decree of the chancery court is reversed, the cross-bill of the defendant, Floriene A. Strong, is dismissed, the original bill of the complainant insurance company is sustained, the policy in question is declared void, and the defendant will surrender same to the complainant.

The costs of the cause, including the costs of the appeal, will be adjudged against the defendant and cross-complainant, Mrs. Floriene A. Strong.

Crownover and DeWitt, JJ., concur.