**John NIX, Plaintiff-in-Error,**

v.

**STATE of Tennessee, Defendant-in-Error.**

Court of Criminal Appeals of Tennessee.

March 18, 1975.

Certiorari Denied by Supreme Court June 30, 1975.

Certiorari Denied Oct. 20, 1975. See 96 S.Ct. 218.

Robt. W. Ritchie and Joseph M. Tipton, Knoxville, for plaintiff in error.

Milton P. Rice, Atty. Gen., David L. Raybin, Asst. Atty. Gen., Nashville, Ronald A. Webster, Dist. Atty. Gen., Knoxville, for defendant in error.

OPINION

OLIVER, Judge.

Represented by retained counsel, Nix was convicted of possessing more than one-half ounce of marijuana with the intent to sell it, for which he was sentenced to imprisonment in the penitentiary for not less than one nor more than five years and to pay a fine of $3,000. (TCA § 52–1422, Schedule VI; TCA § 52–1432(a)(1)(F)). He has perfected an appeal in the nature of a writ of error to this Court.

We address first the defendant's second, third, fourth and fifth Assignments of Error which, collectively, charge that he was illegally arrested without probable cause, that he was interrogated without being advised of his constitutional rights, and that the trial court erred in failing to suppress the defendant's pre-trial custodial statements and evidence obtained by a warrantless search of his apartment to which he did not freely and voluntarily consent. All of these questions were properly raised by defense motions to suppress evidence, which were heard and overruled by the trial court before selection of the jury.

We summarize the material evidence adduced in the suppression hearing, which consumed two days and occupies 292 pages of this record. It was developed that information reached the Knoxville FBI office that a young white man driving a blue Volkswagen bus, bearing Texas license plates, had exchanged a number of small denomination bills for larger bills at several banks; and that about 2:00 p. m. on February 1, 1973, as the defendant parked his Volkswagen bus on the University of Tennessee campus, three FBI agents approached the bus on the driver's side and identified themselves to the defendant.

FBI Agent Phillips testified that the defendant was not placed under arrest; that he was advised of all of his *Miranda* rights with the exception of the right to have the court appoint a lawyer for him if he could not afford one; that he was asked to sit in

the FBI car (it was raining slightly) and talk with them about the money; that in the car the defendant explained that he had won the money gambling and felt he would have a better chance to exchange it for larger bills if he went to several banks rather than just one; that he did not reply when asked why he did not do that at the place he won the money gambling; that he said some of the money was in his apartment; that he told the agents he was a senior at UT majoring in psychology, and that he had been dropped from the football squad because he admitted to Coach Battle that he had smoked marijuana; that he was then asked whether he had any contraband or any illegal narcotics at his residence, and he replied he only had a margarine butter dish of marijuana for his personal use, and said he also had there a .22 caliber derringer; that the agents explained to him they would like to check the serial numbers on the bills and asked him if he would consent to a search of his apartment and he agreed; that, after dismissing the defendant's wife to go to her classes at the university, they went to the defendant's apartment, the defendant driving his bus and accompanied by one agent and the other two agents following in the FBI car; that enroute to the apartment, the defendant stopped at a filling station and bought gasoline, and that he was under no restraint and was not under arrest or being held in custody; that it is FBI procedure to always place a suspect in handcuffs after arresting him, and that the defendant was never handcuffed or searched or restrained in any way by the FBI agents and he was never arrested by any of them; that when they got to the apartment and entered the living room Agent Phillips read to the defendant a consent-to-search form and asked him to sign it, and the defendant read the form himself and inquired what would happen if he did not sign it and Agent Phillips replied that a request would be made for a search warrant; that the defendant asked the agents to step outside for a few minutes and when he was told they could not do so he signed

the form; that the agents then asked him for the marijuana and he produced a very small amount of it which he said was for his own use, and he showed them where the derringer was when they asked about it; and that when they asked him for the money he produced it and counted it in their presence, the aggregate amount being $9290.

While they were counting the money, Knoxville Police Officers arrived. Agent Phillips explained to them what had happened and showed them the consent-to-search form signed by the defendant. Lieutenant Norman, of the Knoxville Police Department Narcotics Division, testified they were there as a result of a call from their dispatcher to meet the FBI at the apartment; that he shook hands with the defendant and advised him orally of his rights and asked him if the narcotics division officers could search his apartment and the defendant agreed; that during the search eight one-pound bricks of marijuana were found; that the defendant was under no restraint until he was taken into custody and placed in the police car; and that he was again advised of his rights enroute to the police station.

The defendant testified in the suppression hearing that he spent the morning of February 1, 1973 going to several Knoxville branch banks exchanging small bills for larger ones, and then he and his wife started to their classes at UT; that the FBI agents identified themselves but did not inform him of his rights and asked him a few questions about changing the money; that they told him to get in the FBI car and he did so, but was not threatened or forced, and they still did not advise him of his rights; that they told him they wanted to see the money and said nothing about wanting to search his apartment; that one of the agents went with him when he went back to his bus to talk to his wife, and then she was released to go to her classes; that he drove his bus to his apartment with one agent accompanying him and the others following in the FBI car; that when they

reached the apartment he asked the agents if they wanted to see the money, and Agent Phillips presented a consent-to-search form and said they would like for him to sign it, and he read it over and told them he wasn't going to sign anything like that; that they told him he would have to sign the form, and that they could get a search warrant by simply making a telephone call; that when he asked the agents to step outside they laughed at him and told him they could not do so, and laughed again and told him to sign the form when he asked them if they were not going to leave, and that he then signed the form, feeling that he had no other choice although he realized the document stated he could refuse to permit a search; that the agents then asked to see the marijuana and the gun and the money; that he was a psychology major at the university at the time; that he turned over the money, $9290, to the FBI and that this money was his and he had other funds at his disposal and he was not indigent and had hired his attorney; that he lied to the agents when he told them he won that money gambling; that as he and the agents went to his apartment it was on his mind that he had marijuana and $9290 there and that he had acquired that money by selling marijuana, and the reason he wanted the officers to leave before he signed the consent form was that he did not want them to find the money and marijuana; that the marijuana found in his apartment was his; and that the FBI agents never informed him that he was under arrest or told him he could not go outside if he wanted to and permitted him to use the telephone, and the bathroom with the door open; that the agents told him he was only making trouble and he would be bringing his wife into the trouble if he did not cooperate; and that when the Knoxville Police arrived he did not consent to their searching his apartment and the first time he was advised of his rights was enroute to the city jail in the police car.

A clinical psychologist testified as a defense witness that he found the defendant to be passive, introverted and indecisive and that he would tend to give in easily in a crisis situation and to become flustered and easily intimidated before authority figures.

At the conclusion of the suppression hearing, the trial judge carefully reviewed the testimony and found as fact (1) that the defendant was never arrested by the FBI agents, although they had probable cause for doing so, and (2) that the defendant was an intelligent and educated young man and understandingly and voluntarily signed the consent form and consented to the search of his apartment. Accordingly, the court overruled the motion to suppress "as to each and every ground."

■ We are bound to adhere to the settled rule that the findings of the trial court, upon questions of fact, are conclusive unless this Court finds that the evidence preponderates against the lower court's judgment. *Bratton v. State*, Tenn.Cr.App., 477 S.W.2d 754. The Supreme Court of this State has held repeatedly that the findings of a trial judge in an oral hearing after seeing and hearing the witnesses testify and hearing and considering conflicting testimony, will be given the weight of a jury verdict. *Taylor v. State*, 180 Tenn. 62, 171 S.W.2d 403; *Atlas Powder Company v. Leister*, 197 Tenn. 491, 274 S.W.2d 364; *Bratton v. State, supra.* This record fully sustains the trial judge's finding that the defendant knowingly and voluntarily consented to the search of his apartment.

"All of the authorities agree a defendant may waive his rights relative to searches and seizures under the Constitutions of the United States and Tennessee. The question of whether or not there was such a waiver and consent to the search is one for the Trial Judge in the first instance." *Shafer v. State*, 214 Tenn. 416, 425, 381 S.W.2d 254, 258.

■ With respect to the failure of the FBI agent to advise the defendant of his right to have an attorney appointed to rep-

resent him if he could not afford to hire one, it is sufficient to say that only an indigent must be advised of the right to appointed counsel. *Carter v. State,* 1 Tenn. Cr.App. 545, 447 S.W.2d 115; *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, Note 43. As above noted, by his own testimony at the suppression hearing the defendant testified that he was not indigent.

The defendant's first Assignment of Error relates to the trial before the jury and, in essence, assails his conviction upon the usual ground that the evidence preponderates against the verdict and in favor of his innocence. This Assignment and Assignments six, seven, eight, nine and ten all relate to his contention that the State failed to prove the marijuana confiscated in his apartment was the species cannabis sativa L which was outlawed by the statute at that time. His claim is that there are three species of the genus cannabis and that it was impossible for anyone to tell to which of the three species (one of which is sativa L) the marijuana in his apartment belonged.

In his opening statement before the jury, the defense counsel admitted "that John Nix did possess a substance which the State alleges is marijuana," and stated the defendant's theory to be that, in addition to the statutory definition of marijuana as cannabis sativa L, there is another species known as cannabis indica and a third one known as cannabis ruderalis, and that a toxicologist being a chemist is not qualified to distinguish between the three different species, "And that therefore, there must be a reasonable doubt as to whether or not the substance introduced in this case is in fact cannabis sativa L."

In the trial before the jury, the testimony of FBI Agent Phillips and Knoxville Police Lieutenant Norman was substantially the same as they gave in the suppression hearing. Of course, since the defendant elected not to testify before the jury, the State made no attempt to refer to or admit statements he made in his own testimony during the suppression hearing.

The defendant complains specifically that the trial court erroneously and prejudicially denied him the right to examine John Barbara as to whether he was qualified as an expert witness with reference to the plant cannabis. The significance attached by the defendant to the point thus raised is that at the time of his indictment and trial TCA § 52–1409(n) provided in pertinent part: " 'Marijuana' means all parts of the plant [cannabis sativa L] . . .," and that actually there are three species of the genus cannabis, and that in order to convict him it was incumbent upon the State to prove beyond a reasonable doubt that the substance he possessed was cannabis sativa L and that the State failed to do so.

Although irrelevant to the case at hand, it is noted that subsequent to the defendant's trial the words "sativa L" were deleted from the statutory definition of marijuana by Chapter 741 of the Acts of 1974, which became effective on 5 April 1974.

When Mr. Barbara was called by the State as an expert witness, defense counsel raised a question as to his qualifications as such. After extended examination and 11 pages of cross-examination, in the course of which he detailed his education and training and experience as a toxicologist and his occupation as technical director of Tennessee's Region III Forensic Science Laboratory, his training and experience in the analysis of various drugs including marijuana and LSD, and his experience in some 2,000 to 3,000 toxicological examinations of various substances and his testimony in court in more than 100 cases as an expert witness in the field of toxicology and identification of substances, the court found that he was an expert witness and so instructed the jury. The question of the competency and qualification of witnesses is to be determined by the trial court. *Harris v. State,* 3 Tenn.Cr. App. 64, 457 S.W.2d 370.

Mr. Barbara received the confiscated marijuana for toxicological analysis. He

testified that the material tested positive for the presence of tetra hydrocannabinol, a chemical compound commonly referred to as THC, which he stated is found only in cannabis sativa L. He testified also that, although he has never studied the botanical classification of the genus cannabis himself, he knows of no other species of this genus than sativa L, and that in his studies and experience he has never heard any convincing or authoritative evidence that there is more than the one species of cannabis, and that the literature of the Bureau of Narcotics and Dangerous Drugs and all the information he had received from the government show only the one species—cannabis sativa L.

Barbara said on cross-examination (which fills an additional 23 pages of the trial record) that he is a chemist and not an expert in botany; that sativa L is a botanical name given to the plant by a taxonomist in the Eighteenth Century; that he is not qualified to classify plants botanically; that sativa L is the species of the genus cannabis, which belongs to the family Cannabinaceae and he knows of no other species of cannabis, but has not made a study as to whether there is more than one species; that he is not familiar with the book *Flora Europaea* nor with a treatise entitled *Flora U.S.S.R.* He had read the chapter on cannabis in Harvard botany professor Dr. Richard E. Schultes' book entitled *The Botany and Chemistry of Hallucinogens,* and said that was the only place he had ever seen a statement in print that there is more than one species of marijuana or cannabis. Asked whether he recognized Dr. Schultes as an expert in the field of botany, he said: "Well, as a chemist, I could not recognize someone in another profession." On re-direct examination he testified that his sources of information define *cannabis ruderalis* and *cannabis indica,* mentioned in Dr. Schultes' book, as sub-divisions or varieties of sativa L.

During the trial the court permitted the sworn testimony of defense witness Dr. William McKinley Klein, Jr. to be tape-recorded by the official court reporter in the presence of the court and counsel, and permitted that recording to be played before the jury. Dr. Klein, a taxonomist and assistant director of the Missouri Botanical Garden, gave an extended discussion of the science of taxonomy, stating that essentially a taxonomist is engaged in the botanical identification and classification of plants. He testified that taxonomists are the only persons capable of classifying plants according to genus and species, and that toxicologists are not qualified to do so; that the genus cannabis is polytypic, which means it has more than one species, and that the three species of cannabis are (1) cannabis sativa L, classified in 1753, (2) cannabis indica, classified in 1783, and (3) cannabis ruderalis, classified in 1924; that the latter two species were of Asiatic and European origin, respectively, and had not met with intensive research or notice in this country until the last few years; that "insofar as we know" each of the three species contains the chemical compound tetra hydrocannabinol and that, therefore, a chemical test could not differentiate the three species; that he could not determine the species of the cannabis confiscated and admitted in evidence in this case, because of its processed condition. He admitted that some treatments of this subject had listed cannabis indica and cannabis ruderalis as sub-species of cannabis sativa L. He also admitted that there was at the moment a difference of opinion in the discipline as a whole as to this question, but said those who have done recent research support the polytypic view. He also said that some of each of the three species may not show the presence of tetra hydrocannabinol under certain conditions, such as the place of growth, the type of soil, the amount of rainfall, etc. During direct examination by defense counsel he identified *The Botany and Chemistry of Hallucinogens* and said the authors are considered reputable authorities in that field. The court sustained the State's objection when defense counsel moved to admit the book in evidence for use in cross-examination. In

cross-examination, the Assistant District Attorney General called to Dr. Klein's attention the same book and read statements therein and asked whether he agreed and Dr. Klein then read another statement in it.

Dr. Aaron J. Sharp, a defense witness who is a botany professor at the University of Tennessee and specializes in plant taxonomy, testified that according to his research there were two or three species of the genus cannabis in the United States, and that they cannot be differentiated by chemical tests, and that taxonomists are the only people who can do so, and that in its present condition he could not be sure that the confiscated material was cannabis and it would be impossible to say what species it was. Dr. Sharp testified on direct examination that Dr. Schultes' book ". . . is a top book as is Dr. Schultes a top man in this field in the United States," and that he had read the portion dealing with cannabis. When defense counsel asked Dr. Sharp to read two paragraphs from the book, to impeach Mr. Barbara, the trial court sustained the State's objection. When Dr. Sharp identified *Flora Europaea* as an authoritative work in the field of plant taxonomy and said he knew the authors and was asked and stated that this book shows two species of cannabis that occur in Europe, the State's objection that this was hearsay was sustained and the jury was instructed to disregard the witness' statements as to what the book said.

■ The weight and value of expert testimony is for the jury and must be received with caution. *Mullendore v. State,* 183 Tenn. 53, 191 S.W.2d 149; *Sparkman v. State,* Tenn.Cr.App., 469 S.W.2d 692.

■ As the sole and exclusive judges of the evidence and of the credibility of the witnesses and the weight and value to be given to the swearing of each and every witness in the case, *Gordon v. State,* Tenn. Cr.App., 478 S.W.2d 911; *Bailey v. State,* Tenn.Cr.App., 479 S.W.2d 829, the jury accredited full credence to the testimony of Mr. Barbara that the marijuana admittedly possessed by the defendant was the type proscribed at that time by TCA § 52–1409(n)—cannabis sativa L. That settled the matter under the established rules governing appellate review of the evidence in criminal cases when its sufficiency is challenged on appeal. *Webster v. State,* 1 Tenn.Cr.App. 1, 425 S.W.2d 799; *McGill v. State,* 4 Tenn.Cr.App. 710, 475 S.W.2d 223.

■ There is no merit in the defendant's complaint that the trial judge sustained the State's objection to a hypothetical question posed to Mr. Barbara as to whether the chemical compound THC was present in any other plant. The court properly sustained objection to that question, for the simple reason that at that time there was no evidence in the record that this substance may be found in any other plant. Hypothetical questions may not be based upon assumed facts not in evidence. *Bailey v. State, supra.*

■ We also find, in the total context of this record, that the trial court did not err in disallowing the defendant's witnesses Klein and Sharp to put into evidence certain portions of the scientific works hereinabove mentioned, for the purpose of undertaking to impeach the State's witness Barbara simply because he testified he was unfamiliar with two of the books and that, as a chemist, he could not recognize the other book (*The Botany and Chemistry of Hallucinogens*) because the author was a member of a different profession. And the court was not in error in declining to admit the books in evidence. When Mr. Barbara testified on cross-examination with reference to the three scientific works as above indicated, defense counsel made no effort to impeach him by *having him read or by reading to him from those treatises.*

The rules with respect to the use and admission of books and scientific treatises is well settled in this State. In *Byers v. Railroad,* 94 Tenn. 345, 29 S.W. 128, our Supreme Court said in 1895:

". . . When a witness is testifying as an expert, it is competent to test his knowledge and accuracy, upon cross-examination, by reading to him or having him read extracts from standard authorities upon the subject-matter involved, and then asking him whether he agreed or disagreed with the authorities, and comparing his opinion with those of the writer. *Hess v. Lowery,* 122 Ind. 225, 23 N.E. 156, 7 L.R.A. 90; *Fisher v. Railroad Co.,* 89 Cal. 399, 26 P. 894; *Railroad Co. v. Allison* (Ga.), 12 S.E. 352; 48 A. & E. R. R. Cases 111; 1 Greenleaf on Evidence, Sec. 440, note (15th Ed.).

\* \* \* \* \* \*

"See 1 Greenleaf on Evidence (15th Ed.), Sec. 440, note E, in which the following propositions are laid down, and cases cited in support: *'The weight of current authority is decidedly against the admission of scientific books in evidence before a jury and allowing such books to be read from to contradict an expert generally. However, it is a proper method of cross-examination, in order to test the learning of a witness who testifies as an expert, to refer to books of approved authority upon the subject under investigation and question him in regard thereto. Scientific books may be used by the attorney in framing his questions for the witness. He may read the questions from such a book to the witness, either on direct or cross-examination. Tompkins v. West,* 56 Conn. [478,] 485, 16 A. 237. *And if an expert has quoted a book, it may be read to him to show that he has misquoted it.* Underhill on Evidence, Sec. 189; *Ripon v. Bittel,* 30 Wis. 614.'" (Emphasis supplied)

In *McCay v. Mitchell,* 62 Tenn.App. 424, 444, 463 S.W.2d 710, 720, the Court said:

"It is established in Tennessee *an expert witness may be cross-examined by the use of standard authorities on the subject.* The Court in *Sale v. Eichberg* (1900) 105 Tenn. 333, 59 S.W. 1020, cited *Byers v. Nashville, C. & St. L. Railroad Co.,* 94 Tenn. 345, 29 S.W. 128, which states: *'When a witness is testifying as an expert, it is competent to test his knowledge and accuracy upon cross-examination by reading to him, or having him read, extracts from standard authorities upon the subject-matter involved, and then asking him whether he agreed or disagreed with the authorities, and comparing his opinion with those of the writer.'*" (Emphasis supplied)

And the Court of Appeals of this State said in *Standard Life Insurance Company v. Strong,* 19 Tenn.App. 404, 424, 89 S.W.2d 367, 379:

"'According to the clear weight of present authority, scientific books and treatises cannot be received as evidence of the matters or opinions which they contain.' Jones on Evidence (2 Ed.), vol. 4, § 1741, p. 3189."

█ Finally, contrary to the defendant's additional insistence, for the same reasons the trial judge committed no error in declining the request to take judicial notice of United States Code § 209, which lists cannabis indica as one of many proscribed poisons. Obviously that federal statute could not impeach Mr. Barbara. See also: TCA § 24–610, with which the defendant did not comply.

Affirmed.

DWYER, J., concurs.

GALBREATH, J., dissents.

GALBREATH, Judge (dissenting).

There can be little doubt that the defendant was under arrest and in custody of the F.B.I. when devastatingly damaging admissions were obtained from him and a search conducted of his apartment. As summarized in the majority opinion, Agent Phillips admits that the defendant while in his own apartment "asked the agents to step outside a few minutes." The agent testified, incredibly, that he advised the defendant that they could not do so. In later testimony,

Agent Phillips admits that the reason the defendant was not left alone as he requested was because they feared "he had something he wanted to dispose of and he just wanted us to step outside a minute or two for this to be accomplished."

When the agents for the F.B.I. refused to permit the defendant his freedom to the privacy of his home, he was in every sense of the word "under arrest." Under a somewhat similar factual situation in which a suspect was closely guarded and refused permission to leave the presence of federal officers during a search, it was logically concluded by the Court that such "restraint . . . and restriction of . . . liberty of movement constituted an arrest." *United States v. Hooper,* D.C.Tenn., 320 F.Supp. 507. Our Supreme Court has long recognized this principle of law:

> It is well settled by the law of arrest that it is not necessary to effect an arrest that there be a manual touching of the body or a formal declaration of arrest; it is sufficient if the person arrested understands that he is in the power of the one arresting and submits in consequence. 4 Am.Jur., § 2, pp. 5, 6; *Robertson v. State,* 184 Tenn. 277, 284, 198 S.W.2d 633. There are numerous cases holding that "requisite control may be assumed without force, or without any visible physical restraint." 6 C.J.S., Arrest, § 1, p. 571. *Murphy v. State,* 194 Tenn. 698, 254 S.W.2d 979.

It is not surprising that the defendant was under close arrest and supervision by the F.B.I. agents. They had a lawful right, as well as a duty, to arrest him, having more than probable cause to believe he had committed the felony for which he now stands convicted. The only problem is that at that time and during the subsequent events when the agents asked the defendant to show them the drugs he produced at their direction, he had not been advised by them of his basic rights. After detailing the advice given the defendant, which did not include his right to have counsel appointed for him, Agent Phillips testified that no further advice was given up to and including the time the damaging admissions against interests were made.

It is quite clear, in spite of the F.B.I. agent's assertion to the contrary, that the defendant, as a matter of fact, was in custody. Counsel for the State relied during the hearing to suppress on the agent's assertion that no arrest had taken place to excuse the failure to adequately warn the defendant of his *Miranda* rights. Inasmuch as arrest *had* occurred, the failure to give the warnings was fatal error.

> In order fully to apprise a person interrogated of the extent of his rights under this system then, it is necessary to warn him not only that he has the right to consult with an attorney, but also that if he is indigent a lawyer will be appointed to represent him. Without this additional warning, the admonition of the right to consult with counsel would often be understood as meaning only that he can consult with a lawyer if he has one or has the funds to obtain one. *Miranda v. State of Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)

Even had the warnings given the defendant at a time when the finger of accusation was unerringly pointed directly at him been full and complete, at the moment the defendant asked the F.B.I. agents to cease and desist in their subtle intimidation by leaving his home this request canceled all consent to further interrogation. For:

> If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. *Miranda v. State of Arizona, supra.*

In *Martin v. State,* 1 Tenn.Cr.App. 282, 440 S.W.2d 624 the arresting officer gave the same limited advice as did Agent Phil-

lips in this case. In reversing a conviction obtained by the use of incriminating admissions made by the defendant, Judge W. Wayne Oliver recounted the circumstances and reached the proper conclusion of law in his opinion:

In the presence of the jury, the . . . officer testified:

"Q State to the Court and jury just what you told him.

A We advised him that he could remain silent, he didn't have to make a statement. That any statement that he made could be used in a Court of law, we advised him that he could get an attorney, or talk to his attorney, or either get him an attorney."

He then related to the jury the oral incriminating statement made by the defendant in which he related some of the inculpatory details of the fatal encounter.

Unquestionably, the trial judge committed prejudicial error in holding that the defendant was adequately advised of his constitutional rights by the arresting officer prior to interrogating him, and in admitting the defendant's oral statements made to that officer during that in-custody interrogation. *Martin v. State, supra.*

Perhaps it is time to retreat from relatively recent defined principles heretofore considered binding on arresting officers and the courts of this State and Nation. But unless we are in a position to overrule the United States Supreme Court's holding in the landmark case of *Miranda v. State of Arizona, supra,* and such opinions as *Martin v. State, supra,* applying these principles in Tennessee, this conviction cannot stand.

In the present status of the law, I am compelled to respectfully dissent from the majority opinion.