# BYERS *v.* RAILROAD

### AND

# ALISTON *v.* RAILROAD.

## (*Nashville.*  January  26,  1895.)

1. COMPROMISE.  *Release of claim for damages.*

Release of claim for damages against a railroad company for the killing of her husband and son, her only means of support, given by an illiterate woman, in ignorance of her rights, and in a state of extreme distress and destitution, in consideration of a railroad ticket worth $3.25 and $70 in money, is not such compromise of her rights as will bar further recovery.  (*Post, pp. 347–349.*)

2. WITNESS.  *Use of books on examination of experts.*

When a witness testifies as an expert, it is competent to test his knowledge and accuracy, upon cross-examination, by reading to him, or having him read, extracts from standard authorities upon the subject-matter involved, and then asking him whether he agreed or disagreed with the authorities, and comparing his opinion with that of the writer.  This principle is here applied to the case of a book treating of air brakes, on the examination of a railroad engineer.  (*Post, pp. 349–351.*)

Cases cited and approved: 7 L. R. A.. 90; 89 Cal., 399; 48 A. & E. R. R. Cases, 111; 56 Conn., 485; 30 Wis., 614.

3. EVIDENCE.  *Reading from scientific works.*

It is error to permit the reading in evidence of scientific books to contradict the testimony of expert witnesses, except in connection with, and as part of, the examination of such witnesses. The objection, however, to the reading of such books is insufficient when made to their use on cross-examination of the witnesses, and not kept up to the subsequent independent reading of them in evidence.  (*Post, p. 351.*)

Byers *v.* Railroad and Aliston *v.* Railroad.

4. SAME. *Of tests or experiments.*

> In suit against railroad for death of person struck by its train, it is competent for defendant to prove, by one of its engineers, an *ex parte* test, made subsequently to the accident, for the purpose of showing that the train that caused the death could not have been stopped after the person killed could have been seen upon the track, when it appears that the test was made at the same place, and under conditions that were, so far as practicable, identical with those surrounding the accident. That the test was *ex parte*, and such as could be made by only one of the parties, goes not to its competency, but to its weight. (*Post, pp. 352–355.*)

> Cases cited and approved: Boyd *v.* State, 14 Lea, 161; Lipes *v.* State, 15 Lea, 125; Railroad *v.* Ayers, 16 Lea, 725; 23 L. R. A., 861.

---

## FROM COFFEE.

---

Appeal from Circuit Court of Coffee County. M. D. SMALLMAN, J.

WM. T. MURRAY for Plaintiffs.

GEO. W. CROSS, CHAS. D. PORTER, EAST & FOGG, and J. D. B. DEBOW for Railroad.

WILKES, J. These causes are suits for personal injuries resulting in the death of Wm. Aliston and his son, Charles Aliston. The causes are different, but arise out of the same accident, and were heard upon substantially the same evidence in the Court below, and are heard together in this Court by agreement of counsel.

There was a verdict by a jury in each case, and judgment was rendered against the railroad company for $1,200 damages for the killing of the father, and $5,000 damages for killing the son, and both cases have been appealed by the railroad company, and it has assigned errors, raising, in the main, the same questions in each case. It appears that the father, with his son, nine years old, and a daughter, five years of age, was attempting to walk from Chattanooga to Nashville, with the intention of continuing the journey on foot to Illinois, where the father had formerly lived. A short distance from War-trace, on the line of defendant's road, the party attempted to cross a railroad bridge of the company, known as Garrison's bridge, and, when they were about the middle of the bridge, which was about one hundred feet long, the father and son were met by a train coming from the direction of Nashville, knocked off the bridge, and killed. The little girl was thrown into the water, also, but escaped without serious injury. It appears that the father was a man about forty-two years of age, and that his eyesight was very much impaired. It is shown that he had been unfortunate, and was reduced to poverty. He came from Knoxville to Chattanooga, bringing with him his wife, a woman about twenty-eight years of age, and the two children, and there they became objects of charity; and were, to some extent, cared for by a charitable association of Chattanooga, until the father decided to make his way, with the chil-

dren, to Illinois, where he had some children by a former marriage, leaving the wife to return to Knoxville, where they had recently lived. Soon after the killing, the mother, being unable to support the little girl, gave her away, and, about the same time, signed a paper releasing all claims for damages against the company, upon the condition that the company give her a ticket to Knoxville, the usual cost of which is $3.35, and pay her the further sum of $70 in money, all of which was done. The company denies its liability for any damages whatever, and pleads that, if liable at all, this arrangement with Mrs. Aliston was a full compromise, satisfaction, and discharge of all liability. Many errors are assigned, which we will not consider in the order in which they are assigned, but as we may find most convenient in arriving at the real questions of difficulty, and the merits of the controversy.

It is assigned as error that the Court should have held the so-called compromise conclusive, and a bar to any further recovery. Compromises made in good faith of doubtful claims, by parties dealing with each other on equal terms, and with opportunities to know their rights, will be sustained by the Courts.

Without entering into detail, we think the arrangement in this case did not rise to the dignity and importance of a compromise, and that the company did not so regard it, but looked upon the amount paid more in the light of a contribution for chari-

table purposes to a woman in dire distress than otherwise. The wife had just lost her husband and son, her only hope of support, and had given away her daughter from necessity. She did not know her rights, evidently was illiterate, and, whether misled or not, she was surrounded by such circumstances, affliction, and distress as made her incompetent to pass upon and surrender her legal rights, if she had a meritorious cause of action, and we would not allow such an arrangement to prevent her recovery if entitled to it.

It is said that error was committed in the cross-examination of the witness, Fravel, the defendant's engineer. This witness testified not only as to the facts attending the killing, but also to some extent as an expert engineer. In conducting the cross-examination plaintiff's attorney used a book published by the Westinghouse Air Brake Company, giving an account of the brake manufactured by them. After several questions had been asked as to what the book was, and as to certain statements contained in it, defendant's attorney objected on the ground that the evidence was incompetent, but made no further or more specific statement of his objection, and it was overruled. After proceeding further, counsel objected to the reading of the book, but made no specific statement of the objection, and it was overruled. The objection, from its connection, does not appear to have been to the book as authority, but to the manner of using it; that is, the witness was

requested to read certain portions, whether to the jury or not does not appear, and was then asked questions as to the correctness of the statements therein, detailing certain tests made of the Westinghouse Air Brake. The witness stated that the book was considered good authority.

After the defendant had closed its evidence, the plaintiff offered evidence in rebuttal, and the plaintiff's attorney then read to the jury portions of the book showing tests made at Cincinnati, in 1887, with the Westinghouse Air Brake. No exception was at this time made to this, and no request was made to exclude it. If the book when first offered had been improperly admitted, it was not necessary to keep up the same objection when it was afterwards offered in the same way, and for the same purpose. But we are of opinion that the objections to the use of the book, as first made, were not well taken. The admission of such evidence is a matter largely in the discretion of the Court, as well as the mode of conducting the examination.

The witness, Fravel, was testifying not only as to the facts connected with the running of this train when the killing occurred, but also as an expert engineer, acquainted with and competent to testify as to the running of trains generally. When a witness is testifying as an expert, it is competent to test his knowledge and accuracy, upon cross-examination, by reading to him or having him read extracts from standard authorities upon the subject-

matter involved, and then asking him whether he agreed or disagreed with the authorities, and comparing his opinion with those of the writer. *Hess* v. *Lowery*, 7 L. R. A., 90; 89 Cal., 399; 48 A. & E. R. R. Cases, 111; 1 Greenleaf on Evidence, Sec. 440, note (15th Ed.).

We think it, therefore, admissible for the attorney to use the book in shaping his questions, and it was not error for him to require the witness to examine and read portions of the book, with a view of testing his knowledge by proper questions, and this, so far as the record shows, is all that was attempted to be done in the first examination, when the objection was made. But reading the book to the jury as evidence of the facts therein stated, and as a general rebuttal of the testimony of the expert, stands on a different basis. It does not appear that this was done during the examination and cross-examination of the defendant's witnesses, but after they were through, then the book was introduced again by the plaintiff's counsel and several pages read to the jury, and no objection was at this time made. In the absence of such objection, made when the book was thus offered and read for this purpose and in this way, there is no reversible error.

See 1 Greenleaf on Evidence (15th Ed.), Sec. 440, note E, in which the following propositions are laid down and cases cited in support: "The weight of current authority is decidedly against the admission

of scientific books in evidence before a jury and allowing such books to be read from to contradict an expert generally. However, it is a proper method of cross-examination, in order to test the learning of a witness who testifies as an expert, to refer to books of approved authority upon the subject under investigation and question him in regard thereto. Scientific books may be used by the attorney in framing his questions for the witness. He may read the question from such a book to the witness, either on direct or cross-examination. *Thompkins* v. *West,* 56 Conn., 485. And if an expert has quoted a book, it may be read to him to show that he has misquoted it. Underhill on Evidence, Sec. 189; *Rippon* v. *Bittel,* 30 Wis., 614."

It is next assigned as error that the Court excluded the testimony of Henry Mangrum, who, at the request of the company, made an actual test to see whether the train that caused the death could have been stopped after the engineer saw or could have seen the man on the bridge. This witness proposed to prove that he ran the same train on a different day, after the accident, over the same place and bridge; that he had the same number of coaches; that, in making the test, as soon as he could, by being on the lookout, see an object standing on the center of the bridge, he applied every means known to him or other skillful engineers, and used every endeavor to stop his train, and that it was impossible to stop such a train before passing over the

bridge, and that his entire train passed over the bridge before he was able to stop it. He further would have testified, if allowed, that he applied his air brakes, reversed his engine, and used every means known to engineers to effect the stop, but was unable to do so. This test was made by Mangrum for the purpose of making him a witness and proving the result of the test. This evidence, on objection, was not allowed to be given.

The authorities in other States are conflicting upon the admissibility of such evidence, and we have been cited to many cases, all of which we have examined. In our own State, it has been held that the evidence of an expert is not incompetent because of an *ex parte* examination, investigation, or experiment made by him. Nor is such evidence inadmissible because the experiments are made after the suit and trial has begun, and with a view to being used as testimony in the case. The objection in such cases goes not to the competency or admissibility of the testimony, which is a matter for the Court to determine, but to its weight and sufficiency before the jury, and especially is this the case where the experiment is made *ex parte*, and is such that it lies wholly within the power of one party and wholly beyond the power of another party to make such experiment. We have been cited to quite a number of authorities to sustain the contention that such evidence is incompetent and inadmissible in cases where the experiment is not equally

23—10 P

within the reach of both parties, but we have not been able to find this doctrine sustained. We do find cases, however, holding that where the experiment is made *ex parte* it affects its weight; that it was not made after due notice to the opposing party and giving such party opportunity to be present and see the test applied. That such evidence is competent, but its weight to be duly weighed by the jury is supported by the following authorities : *Boyd* v. *The State,* 14 Lea, 161; *Lipes* v. *The State,* 15 Lea, 125; *Miss. & Tenn. R. R. Co.* v. *Jno. R. Ayers,* 16 Lea, 725 ; *C., St. L. & P. R. R. Co.* v. *Champion,* 23 L. R. A., 861 ; Underhill on Evidence, Sec. 201, and others in accord.

It is uniformly held that in all such tests, to make them competent, the conditions under which the tests were made must be the same as near as practicable. This requirement appears to have been substantially complied with in this case, and, judging from the testimony offered to be given, the conditions of the test were essentially the same as when the accident occurred.

We are of opinion the trial Judge was in error in not allowing evidence of this test to be introduced under proper instructions to the jury as to its weight. We cannot speculate on what might have been the verdict of the jury if this evidence had been allowed to be introduced. It was upon a vital point in the controversy. The plaintiff had been permitted to prove by a witness that he had

gone upon the tracks and measured the distance at which a man could be seen standing in the middle of the bridge, and a hot contest was made over the question how far a man could be seen on approaching the bridge, and opinions pro and con were introduced on the question whether it would be possible to stop the train after reaching a point where a man could first be seen by a lookout upon an approaching train. This is the turning point in the case, and the evidence was very conflicting, and for this error in the Court in rejecting evidence of this test, the cause must be reversed and remanded for a new trial.

We have examined all the other assignments of error, and we think none of them are well taken, but reverse simply upon the error indicated.

The appellees will pay the costs of appeal.