James E. CARY and wife, Patricia S. Cary, Plaintiffs–Appellants,

v.

Peter N. ARROWSMITH, M.D., Peter N. Arrowsmith, M.D., P.C., Defendants–Appellees,

and

Medical Care International, Inc., d/b/a Parkside Surgery Center, Defendant.

Court of Appeals of Tennessee, Middle Section, at Nashville.

Feb. 15, 1989.

Rehearing Denied March 10, 1989.

Application for Permission to Appeal Denied by Supreme Court Aug. 7, 1989.

Robert L. Trentham, Taylor, Schlater, Lassiter, Tidwell & Trentham, Nashville, for plaintiffs-appellants.

Noel F. Stahl, W. Gregory Miller, Cornelius & Collins, Nashville, for defendants-appellees.

## OPINION

LEWIS, Judge.

This is an appeal by plaintiffs James E. Cary and Patricia A. Cary[1] from a judgment entered on the jury's verdict finding for defendants, Peter M. Arrowsmith, M.D. individually and his professional corporation Peter M. Arrowsmith, M.D.,P.C.[2] Plaintiffs sought both compensatory and punitive damages for defendant's alleged malpractice.

The case went to the jury on the plaintiff's theory (1) that defendant failed to obtain plaintiff's informed consent to eye surgery and (2) whether it was negligence to prescribe for plaintiff's post-operative

---

**1.** Hereafter references to plaintiff will refer only to plaintiff James E. Cary and not to his wife, Patricia S. Cary, unless otherwise noted.

**2.** Unless otherwise noted, the use of defendant in the singular will refer to Peter M. Arrowsmith individually and Peter M. Arrowsmith, M.D., P.C.

use the drug phospholine iodide. The jury returned a general verdict in favor of defendant.

The pertinent facts are as follows:

Defendant is an ophthalmologist in Nashville, Tennessee, who is known for his expertise in radial keratotomy surgery. Plaintiff James E. Cary was a patient of defendant. Plaintiff Patricia S. Cary is the wife of James E. Cary and sued for loss of consortium.

In 1983 plaintiff was forty-two years old and had worn eye glasses to correct nearsightedness since he was in the eighth grade. Prior to 1983, plaintiff had attempted to wear hard contact lens and, later, soft contact lens, but had been unable to do so because of discomfort and poor vision.

In 1983, plaintiff learned from a friend John Ellis about radial keratotomy surgery. Radial keratotomy is a surgical procedure designed to correct nearsightedness by making a series of radial incisions on the cornea which change the shape of the cornea. Mr. Ellis had already been to see defendant to be evaluated for radial keratotomy, had viewed a video tape, and talked with defendant about the surgical procedure.

Mr. Ellis informed plaintiff that he was "chicken" and had decided not to have the surgery because of the risks involved. Plaintiff told Mr. Ellis that he was not "chicken" and that he would take the risks if he could get rid of his eye glasses.

Plaintiff visited defendant for an initial evaluation on 27 September 1983. At that time he had various eye examinations conducted by defendant and defendant's technicians. This included an examination of plaintiff's retina. None of the examinations revealed any condition which contraindicated radial keratotomy surgery.

During plaintiff's visit on 27 September 1983, defendant showed plaintiff a thirty-five minute informational lecture by defendant on video tape. The video tape described the history of radial keratotomy, the manner of performing the surgery, its effectiveness, and numerous other topics. The video tape included pictures of radial keratotomy surgery actually being performed. The video tape also included a discussion by defendant of various post-operative complications, including glare, fluctuating vision, blurred vision, ghosts images, imperfect correction resulting in under correction or over correction, worsening of the astigmatism, the possible need for further surgery and the uncertainty about the long-term safety and effectiveness of radial keratotomy surgery. The video tape did not inform plaintiff that he could go blind or die as a result of the surgery.

After viewing the video tape plaintiff had the opportunity to write down any questions which he might have. He had no questions.

Plaintiff then met with defendant who examined his eyes and went into more detail concerning the radial keratotomy procedure. Plaintiff then signed a consent to surgery document.

Plaintiff testified by deposition that during the 27 September 1983 meeting with defendant he had asked defendant no questions concerning the surgery and had said nothing to defendant except that he had seen the video tape and that he wanted the surgery done. At trial, plaintiff testified that he did ask the defendant questions about the procedure. In his deposition plaintiff denied that defendant ever mentioned the possibility of an infection and said the word infection was never raised in the meeting. At trial, plaintiff changed his testimony and admitted that defendant did tell him of the risk of infection.

At trial plaintiff denied that he had been advised of any risk of death or blindness from the surgery. He did admit that he had memory problems and that he had difficulty remembering exactly what was done or said in defendant's office. He also admitted that defendant might have discussed risks with him which he just did not recall.

Plaintiff further testified at trial that if he had been advised of any risk of death or blindness, he would not have consented to the surgery. In his deposition, which was read to the jury, he stated that if he had

been advised of a risk of death or blindness, he had no way of knowing whether he would or would not have consented to the surgery.

Defendant testified concerning his 27 September 1983 meeting with plaintiff as to what his routine and custom was in informing patients. He testified that he told plaintiff what he told all other patients who were considering radial keratotomy surgery.

Defendant testified that physicians are not obligated to grab the patient and tell them "don't you know you could die or go blind from this." He testified, instead, that it was his opinion that the remote risk of death or blindness could be communicated to the patient by placing it in a proper context and telling the patient that virtually anything could happen in any type of surgery, including radial keratotomy, and that there were no guarantees with any surgery, that something disastrous could happen, including a life-threatening complication.

The "Informed Consent for Radial keratotomy," which was presented to plaintiff and signed by him, contains the statement that "the risks of my [defendant's] surgery cannot be guaranteed." The informed consent form also includes, among others, statements concerning the risks of uncontrolled infection, the possibility that the patient's vision could be worsened, the possibilities of visual distortion, over correction and under correction.

Plaintiff testified that he signed this form and consented to the radial keratotomy surgery without reading the form. He testified at trial that he was not pressured by defendant in any way to consent to radial keratotomy and that he could have walked out of the office without scheduling the surgery.

Prior to undergoing the surgery, plaintiff was required to return to defendant's office to read and sign the same four-page consent form once again. Plaintiff testified that he, for the second time, signed the four-page consent form without reading it, but that he did "glance" over the form.

The radial keratotomy surgery was performed by defendant on plaintiff on 4 January 1984 and resulted in an over correction or farsightedness in plaintiff's left eye. Plaintiff testified that the vision in his left eye was never satisfactory and that it was never good enough for him to consider having surgery on his right eye. Plaintiff's medical records reflect, however, that for several weeks after the surgery the vision in his left eye was 20/40 and good enough for him to see without glasses. Plaintiff subsequently reported to Dr. Stephen Feman, an expert witness who testified on behalf of plaintiff, that his vision for several weeks after surgery was improved and that he had been able to see without glasses.

The evidence also shows that plaintiff was satisfied enough with the results in his left eye that he signed a consent to surgery form on 1 February 1984 for surgery to be performed on his right eye. When confronted with this on cross-examination, plaintiff could not explain why he had signed the 1 February 1984 consent form if the vision in his left eye had never been satisfactory.

On 1 February 1984, plaintiff's left eye began showing signs of over correction with resulting farsightedness. Defendant first prescribed timolol, an eye drop which lowers pressure inside the eye and thereby reduces the flattening effect of radial keratotomy by reducing the outward pressure from within. This medication proved to be ineffective and plaintiff's farsightedness worsened some ten percent.

After this medication failed, defendant prescribed phospholine iodide. Phospholine iodide is an eye drop which reduces pressure. This was intended to lower plaintiff's inter-ocular pressure during the healing phase of the surgery.

Normally the incision on the cornea heals and the eye's permanent shape is attained between three and twelve months following radial keratotomy. Defendant hoped to reduce the pressure within the eye and eliminate plaintiff's farsightedness by using phospholine iodide during this healing phase.

On 14 February 1984, when defendant prescribed phospholine iodide for plaintiff, he did not examine plaintiff's retina. The lattice degeneration in plaintiff's eye was present when defendant first examined him in September 1983 and was also present when defendant prescribed phospholine iodide for plaintiff in February 1984, although the lattice degeneration was not found by defendant on either occasion.

The evidence is that phospholine iodide has many significant risks associated with its use. The manufacturer of phospholine iodide warns of a possible correlation between the use of phospholine iodide and retinal detachment. A person who is myopic, such as plaintiff, is more predisposed towards a retinal detachment than someone who is not. At the time of plaintiff's surgery, he had lattice degeneration of the retina [3] which also made him more predisposed toward a retinal detachment.

Defendant prescribed the phospholine iodide for plaintiff at its highest concentration of ¼ percent. Shortly after prescribing the phospholine iodide plaintiff testified that he reported to defendant's office that he was suffering symptomatic side effects of the drug like headaches and dizziness. Plaintiff was kept on the eye drops at a lesser strength. He continued to complain of severe headaches and other side effects. Plaintiff remained on the phospholine iodide until his retina detached in June 1984. Plaintiff testified that during the time he was using the phospholine iodide and experiencing complications from its use, defendant did not ask him to come to his office in order to examine his retina.

Defendant testified that he learned of the use of phospholine iodide and other pressure-reducing medications to treat over correction in radial keratotomy patients at medical meetings, from articles in medical literature, in textbooks, and from other physicians who advocated its use for this purpose. Defendant further testified that when he prescribed phospholine iodide for plaintiff he explained to plaintiff that there were possible side effects associated with the use of phospholine iodide, including cataracts and inflammation of the eye, that he also told plaintiff there had been reports that retinal detachments had occurred in patients who had used phospholine iodide, and that he informed the plaintiff of this even though he did not believe that phospholine iodide caused retinal detachment and did not believe the standard of care required warning of any such risk.

Defendant testified that he did not re-examine plaintiff's retina before prescribing phospholine iodide because he had already examined the plaintiff's retina prior to the 4 January 1984 surgery and there was no need to examine it again in February 1984. On his pre-operative examination of plaintiff's retina, defendant did not note the presence of lattice degeneration, but testified there may have been some questionable area which he saw but did not note.

Defendant also testified that had he detected lattice degeneration in plaintiff this would not have been a contra-indication for radial keratotomy. He further testified that there was no evidence that radial keratotomy surgery initiates, promotes, or advances lattice degeneration of the eye and that there is no evidence that radial keratotomy causes retinal detachments in the human eye whether there is lattice degeneration or not.

There is evidence in the record that the condition of lattice degeneration of the retina makes one more predisposed toward a retinal detachment.

Plaintiff testified that when the defendant prescribed phospholine iodide in 1984 he did not tell him anything about why he was prescribing phospholine iodide other than that it was going to make him see better. He testified that he was never informed of any risk or consequence associated with the use of phospholine iodide.

In his sworn response to interrogatories, plaintiff admitted that the defendant did

---

**3.** Lattice degeneration is an inherited characteristic in which there is deterioration and slight thinning of an area on the retina caused by many years of natural movement and pulling by the vitreous fluid in the eye. It is identified by pigmentary changes on the retina which may or may not be visible to the physician on a retinal examination.

identify the drug and also explain how it was intended to work and help improve his vision. On cross-examination, plaintiff did admit that defendant told him what phospholine iodide would do. He simply could not remember the date this was told to him by defendant.

There is evidence that when the phospholine iodide was prescribed in a lesser concentration, plaintiff no longer complained of the headaches and other side effects.

In late May 1984, plaintiff noticed a small dark spot in his left eye. He called defendant's office and asked to speak with defendant. Plaintiff was informed that defendant was out of town. Plaintiff did not describe the nature of the problem he wished to discuss with defendant. Two days later, plaintiff called defendant's office again and was told that he was still out of town. Plaintiff again did not describe the nature of his problem.

Over the Memorial Day weekend, the dark spot in plaintiff's eye became larger but he made no effort to seek medical attention elsewhere.

On Tuesday, 31 May 1984, a week after first noticing the spot in his eye, plaintiff called defendant's office again and, for the first time, described the nature of his problem to one of the technicians in defendant's office. Defendant was still out of town and the technician immediately referred plaintiff to Dr. Roland Hawkins, another Nashville ophthalmologist. Plaintiff attempted to cancel this examination because he had a house closing scheduled that day but the personnel in defendant's office insisted that he keep the appointment.

Dr. Hawkins examined plaintiff on 31 May, diagnosed a retinal detachment, and spoke to Dr. Stephen Feman about plaintiff's condition. Dr. Hawkins asked Dr. Feman to see plaintiff as a patient. Dr. Feman did not see plaintiff until the following day.

When Dr. Feman examined plaintiff on 1 June 1984, he recommended surgery to repair plaintiff's retina. Dr. Feman determined that plaintiff had a small tear in his retina associated with lattice degeneration.

Dr. Feman testified that, on first examination, plaintiff had vision out of his left eye of hand motion at two feet and that he had sustained a detached retina which Dr. Feman attempted to surgically repair. Dr. Feman further testified that he continued to follow plaintiff's progress following the surgery and that his best corrected vision in the left eye was 20/400 which is in the range of being able to count fingers at four feet, and Dr. Feman did not expect plaintiff's vision in the left eye to ever improve.

Dr. Feman also testified that the recognized standard of care required a physician to inform a patient prior to undergoing eye surgery such as radial keratotomy that his vision could be made worse by the procedure, that he could potentially lose the eye, and that there was a possibility he could die during the operation.

Plaintiff testified that Dr. Feman did not mention to him any risks of death or loss of the eye before performing the surgery to repair the detached retina. Additionally, the consent form used by Dr. Feman in plaintiff's case and the hospital chart both failed to mention death, blindness, loss of the eye, or any other risks being communicated to plaintiff prior to the surgery for detached retina.

Dr. Feman, who testified for plaintiff as an expert witness regarding standard of care for obtaining informed consent for radial keratotomy, had never performed radial keratotomy on a patient and had never personally witnessed the surgery performed. His only experience was in 1974 when he performed the surgery on a rabbit and on one other occasion when he viewed on a television monitor the surgery being performed.

Dr. Feman had never obtained informed consent from any patient considering radial keratotomy surgery and did not know what any other doctor was doing in January 1984 with regard to advising patients concerning the risks and benefits of radial keratotomy surgery. He admitted that he was not an expert on radial keratotomy and that this surgery is outside his field of interest.

Dr. Feman testified that he had reviewed the written consent document used to ob-

tain plaintiff's consent to radial keratotomy, had considered the oral information plaintiff reported defendant gave to plaintiff, and had seen the video tape that defendant showed plaintiff. Dr. Feman was of the opinion that the information given to plaintiff was inadequate to obtain his informed consent because it left out major aspects of the risks associated with radial keratotomy, including the potential loss of vision and possible loss of the patient's life.

When he was cross-examined and shown the documents he used in connection with plaintiff's retinal repair surgery at Vanderbilt Hospital, which contained no mention of blindness, death or any other risk, Dr. Feman changed his opinion and said it was satisfactory if the records state generally that the risks of complications of surgery have been discussed with the patient.

Defendant testified regarding the issue of informed consent that the standard of care did require advising patients of the risks of failed surgery, blindness, and death, that the standard of care allowed physicians to put these risks in the context of the contemplated procedure and to advise patients that virtually anything can happen during any surgery, that there are no guarantees, and that even life-threatening complications could occur.

Defendant testified that he informed plaintiff on 27 September 1983 of these risks by means of video tape, discussions with plaintiff, and the written consent form. The consent form specifically mentioned the possibilities of worsening vision, under correction, over correction, visual distortions, and some other risks. The consent form also included the general language that the risks of surgery were discussed with the plaintiff and, this, Dr. Feman admitted, was acceptable.

Dr. Feman also testified regarding the drug, phospholine iodide. He testified that in 1979, phospholine iodide had been largely replaced by a drug with less dangerous side effects and that in January 1984 there were not many medically recognized uses for phospholine iodide. He further testified that there were many known side effects of the drug and that the manufactur-

er's literature accompanying the drug warns of a possible correlation between its use and retinal detachments. He testified on direct examination that it was his belief that radial keratotomy, combined with phospholine iodide, caused plaintiff's retinal detachment. On cross-examination, he admitted that radial keratotomy itself cannot cause retinal detachment.

Dr. Feman conceded that he was not an expert on the subject of ocular pharmacology and that he did not know the mechanism by which phospholine iodide might cause a retina to detach. He also admitted that there is no body of medical literature that demonstrates a causal relationship between phospholine iodide and retinal detachments.

Dr. Feman further conceded that in his pretrial deposition he had stated he had no opinion about what caused plaintiff's retinal detachment. He agreed that plaintiff's myopia and lattice degeneration were pre-existing abnormalities which predisposed him to have a retinal detachment and that these natural conditions alone might have caused plaintiff's retina to detach.

Dr. Feman also testified that his opinions about the causal relationship between phospholine iodide and retinal detachments were accurately stated in the medical article concerning plaintiff's case which he co-authored and published in March 1986. In this article, Dr. Feman admits there is no proof of any cause-effect relationship between phospholine iodide and retinal detachments.

One of the references which Dr. Feman relied upon in his March 1986 paper was the text of *Ocular Pharmacology* (5th ed.) written Dr. William Havener. Dr. Feman agreed that Dr. Havener's text *Ocular Pharmacology* is an authoritative text in the field of ocular pharmacology and that he, Dr. Feman, would defer to an ocular pharmacologist about the relationship between phospholine iodide and retinal detachment.

Dr. William Havener was called by the defendant. Dr. Havener is Professor of Medicine and Chairman of the Department of Ophthalmology at Ohio State University.

His medical text book, *Ocular Pharmacology*, is a leading reference work on the subject of ocular pharmacology.

Dr. Havener testified concerning the physiology of the eye and how it responds when phospholine iodide is used to medicate it. He stated that prior to laser therapy and newer drugs, phospholine iodide had been very valuable in the treatment of certain patients. He further testified that because of some reports of retinal detachments among cataract-glaucoma patients, some physicians had postulated a possible relationship between phospholine iodide and retinal detachments. He testified, however, that those theories were incorrect, that phospholine iodide actually reduces tension inside the eye and cannot cause a retinal detachment.

Dr. Havener also testified that patients who typically received phospholine iodide were myopic. They have lattice degeneration present in the eye and many have major complications such as cataracts or glaucoma and are already highly predisposed to have retinal detachments.

It was Dr. Havener's opinion that plaintiff's retina detached because a hole developed in an area of lattice degeneration which was due to inherited genetic factors and was, therefore, due to natural causes, and not from the use of phospholine iodide.

The first of plaintiff's nine issues is:

Whether the trial court erred in refusing to allow plaintiffs' counsel to question Dr. Arrowsmith with regard to his former patients, Frank M. Michitti and Larry Hanson, both of whom had been blinded from radial keratotomy procedures performed on them by Dr. Arrowsmith prior to Mr. Cary's surgery in January of 1984.

Defendant moved *in limine* that plaintiff not be allowed to introduce into evidence medical records of Larry Hanson and Frank Michitti or to introduce testimony concerning the loss of vision in Mr. Hanson's and Mr. Michitti's eyes following surgery. The motion was granted.

In June 1983, defendant performed radial keratotomy surgery upon Larry Hanson.

The anaesthesia used was retro bulbar anaesthesia. Mr. Hanson, following the surgery, had permanent central blindness in the eye on which radial keratotomy was performed.

In August 1983 the defendant performed radial keratotomy surgery upon Frank Michitti, also using retro bulbar anaesthesia. Mr. Michitti, following the surgery, had permanent central blindness in the eye on which the surgery was performed.

Plaintiff insists that the trial court erred because "loss of vision sustained by Mr. Larry Hanson and Mr. Frank Michitti after radial keratotomy surgery was performed on them by Dr. Arrowsmith was highly relevant and material to the plaintiff's cause of action" based on the lack of informed consent for radial keratotomy.

In an "informed consent" case, the issues to be determined are: (1) What is the appropriate information which should be supplied to a patient considering whether to consent to the procedure, and (2) was that information supplied to the plaintiff?

In the consent form signed by plaintiff, the following statements are made:

This procedure has been performed in the Soviet Union for a period of eight (8) years and over 6,000 eyes have been done. It has been performed in the United States for a period of three (3) years and over 7,000 cases have been done....

. . . .

Although it has been explained to me that the safety record of this surgery is extremely good over the period of time during which investigation has been conducted, I understand that as a result of the surgery, many possible complications could occur....

. . . .

I have been told, however, that due to the safety record of this operation to date (during the period of time that this surgery has been performed there have been no eyes which have been lost or which have gone blind) and based on existing studies and evidence at this time, the likelihood of long-term serious complications appears slight....

The video tape which was shown to plaintiff makes the following statements and representations regarding radial keratotomy surgery:

In my studies in the Soviet Union I was able to observe the results of radial keratotomy surgery on human patients and it appeared that the surgery was both effective and safe.

In the United States I have studied radial keratotomy and investigated, performed research concerning the surgery over the past two and a half years since December of 1980. Radial keratotomy is a procedure which at this point in time I feel comfortable saying works to correct nearsightedness and astigmatism. It is effective and appears to be safe, both short-term and over the period of time that we have studied the procedure. . . .

All indications make it appear that your results should be permanent and stable and we have found no indication that any harmful effects from surgery exist or appear to be showing up as a result of the operation. . . .

■ At trial, plaintiff made an offer of proof which established that in June 1983, seven months prior to plaintiff's surgery, Larry Hanson, as a result of retro bulbar anaesthesia was permanently blinded in one eye and, five months prior to plaintiff's surgery, Frank Michitti was blinded in one eye as a result of retro bulbar anaesthesia.

Retro bulbar anaesthesia, in both cases, was administered in conjunction with the radial keratotomy surgery. The radial keratotomy surgery did not cause the blindness in either Mr. Hanson or Mr. Michitti.

Both Mr. Hanson and Mr. Michitti suffered vision loss as a result of the retro bulbar anaesthesia administered prior to their radial keratotomy surgery. Retro bulbar anaesthesia is administered by using a needle to inject an anaesthetic agent behind the eyeball near the optic nerve.

Plaintiff did not undergo the same procedure as Mr. Hanson and Mr. Michitti. Plaintiff's anaesthesia was administered by drops in the eye and not by using a needle to inject an anaesthetic agent. The eye drops have never been known to cause loss of vision or blindness in any person. Also, plaintiff alleged that his injury was caused by phospholine iodide prescribed quite some time after the surgery and not by the anaesthesia administered prior to the surgery. Neither Mr. Hanson nor Mr. Michitti ever received phospholine iodide and neither ever contended that any post-operative treatment by defendant caused their visual losses.

Plaintiff's visual loss was caused by retinal detachment. Mr. Hanson's and Mr. Michitti's visual losses were caused by damage to their optic nerves. Different procedures were used with the plaintiff than those used on Mr. Hanson and Mr. Michitti. Plaintiff's type of injury was different from Mr. Hanson's and Mr. Michitti's. Plaintiff's cause of injury was different from Mr. Hanson's and Mr. Michitti's. As defendant pointed out, the only thing that Mr. Hanson, Mr. Michitti and plaintiff had in common was that none of them suffered visual loss because of radial keratotomy.

Any probative value the introduction of evidence of Mr. Hanson's and Mr. Michitti's loss of vision would have had was far outweighed by the chance for prejudice. "[E]vidence that tends more strongly to prove immaterial prejudicial issues than to prove a legitimate inference is inadmissible, for the jury system has inherent human frailties." Paine, *Tennessee Law of Evidence* § 1 (1974).

This issue is without merit.

Plaintiffs' second issue is:

Whether the court erred in refusing to allow the plaintiffs' expert witness, Dr. Stephen Feman, to express the opinion that the statement in the written document used by Dr. Arrowsmith to obtain Mr. Cary's consent to surgery to the effect that no eyes had been lost or had gone blind as a result of radial keratotomy was false and misleading in light of Dr. Feman's personal knowledge of Dr. Arrowsmith's experience with Mr. Hanson and Mr. Michitti and in light of Dr. Feman's knowledge of the number of cases which had been reported in the

scientific literature where patients had suffered significant loss of vision following radial keratotomy procedures.

■ Mr. Hanson and Mr. Michitti suffered their loss of vision from retro bulbar anaesthesia, an entirely different anaesthesia than was administered to plaintiff. To have allowed Dr. Feman to testify regarding Mr. Hanson and Mr. Michitti's vision loss would have been to allow him to testify regarding collateral matters which would have been prejudicial.

■ Plaintiffs also complain that Dr. Feman was not allowed to testify "that in his opinion it was a violation of the standard of care to make that representation [that no eyes had been lost or gone blind], because of the reported cases, five or six reported cases, in the medical literature of partial blindness that had resulted in patients" from radial keratotomy.

Plaintiffs attempted to have Dr. Feman give substantive evidence concerning other persons who had purportedly had radial keratotomy surgery and suffered partial blindness. Dr. Feman had read about these other persons in unspecified medical literature.

Dr. Feman would not have been allowed to read from the medical literature to establish substantive evidence of the matters contained in the medical literature. *Byers v. Nashville City & State L. Ry. Co.*, 94 Tenn. 345, 351–52, 29 S.W. 128, 129 (1895); *Standard Life Insurance Co. v. Strong*, 19 Tenn.App. 404, 424, 89 S.W.2d 367, 379 (1935). He may not read that literature and then testify on what the literature states. This evidence was clearly hearsay and properly excluded by the trial court.

This issue is without merit.

Plaintiffs' third issue is: "Whether the court erred in admitting the testimony of Dr. Maureen Powers."

Dr. Maureen Powers is a Professor of Psychology at Vanderbilt University in Nashville. Her primary fields of interest are visual physiology, psychology and the mechanisms associated with human visual perceptions.

In 1982, Dr. Powers began a collaboration with two other college professors and defendant on a psycho-social study of patients who had undergone radial keratotomy surgery. The study was intended to determine the patients' objective feelings about their surgical results, the effects it had on their self esteem, their changes in lifestyle and overall satisfaction. Dr. Arrowsmith agreed to the publication of the study whether the results were favorable or not. Dr. Powers was the principal scientist and principal author of the report.

Dr. Powers and her colleagues sent out questionnaires to 101 former patients on whom defendant had performed radial keratotomy. Eighty-eight responses were received.

Dr. Powers, over objections by plaintiff that Dr. Powers' testimony was based on hearsay, was allowed to testify that ninety-four percent of those responding to the questionnaire reported that their vision was better than it had been before surgery, eighty-four percent were satisfied with the outcome of the surgery, and seventy percent were extremely satisfied with the outcome.

Dr. Powers further testified as follows: REDIRECT EXAMINATION BY MR. STAHL:

Q. What percentage did you say was overall very pleased and satisfied with this?

THE COURT: I think you have covered that point.

MR. STAHL: All right. Well, there is one that I didn't cover that Mr. Trentham prompts me to inquire about.

Q. Did you ask the patients on this survey about whether they felt like they had been adequately prepared for the operation in terms of having their questions answered satisfactorily by the ophthalmologist?

A. Yes, I did.

Q. Tell the ladies and gentlemen of the jury what the people reported in that regard.

A. Excuse me for referring to my notes. Again, the numbers don't hang in my head. The individuals said, 95 per-

cent of them reported this, that they had been adequately prepared for the operation in terms of having their questions answered satisfactorily by the ophthalmologist before the operation.

Q. So although there was 14 percent who had been extremely dissatisfied, you found that 95.5 percent of all of the patients surveyed felt that they had had all of their questions answered satisfactorily and had been adequately prepared for the surgery by the ophthalmologist?

A. That's correct.

MR. STAHL: That's all.

None of the patients who completed and returned the questionnaire were called as witnesses.

Plaintiff objected to Dr. Powers' testimony on the ground that it was "hearsay."

Defendant argues that since Dr. Powers did not testify regarding personal statements of any individual patient but only the results of their combined statements, her testimony was not hearsay.

"Hearsay evidence is testimony in court, or written evidence, of a statement made out of court, such statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value on the credibility of the out-of-court asserter." *McCormick on Evidence* § 246 (2d ed.1972).

■ The fact that Dr. Powers collected answers from eighty-eight individuals, tabulated those answers and reported that a number of those individuals answered a question in one manner does not render the statements any less hearsay than if Dr. Powers had reported only what one individual said, if the statements were offered "to show the truth of the matters asserted therein." Mr. Paine, in his *Tennessee Law of Evidence* § 47 (1974), poses two questions which are to be determined when extrajudicial statements are offered as evidence: "1. Does the purpose of the offer require the out-of-court statement to be taken as true?" and "2. Would cross-examination of the declarant be helpful?"

The answer in this case to both questions is "yes."

The objection to Dr. Powers' testimony should have been sustained on the ground that it was hearsay.

■ However, "[a] final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn.R. App.P. 36(b).

We do not believe that Dr. Powers' testimony that ninety-four percent of those responding reported their vision was better than it had been before surgery, eighty-four percent were satisfied with the surgery, and seventy percent were extremely satisfied "more probably than not affected the judgment." Whether the jury believed or did not believe this testimony would make little difference as to the issue of whether plaintiff was adequately informed by defendant before giving his consent to the surgery. Thus, we are of the opinion this portion of the testimony was harmless.

■ However, Dr. Powers' testimony that 95.5 percent of the eighty-eight patients who returned their questionnaires stated they had their questions answered satisfactorily and that they "had been adequately prepared for the surgery by the" defendant was prejudicial to plaintiff's claim that he did not give an "informed consent" to the radial keratotomy procedure because he was not adequately informed.

Defendant had testified in detail regarding the information he imparted to plaintiff prior to plaintiff signing the consent to operate form. The testimony of Dr. Powers that 95.5 percent of those responding, that is, eighty-four of eighty-eight persons, had their questions answered satisfactorily and had been adequately prepared for the surgery is powerful corroboration of defendant's testimony.

This portion of Dr. Powers' testimony went directly to the heart of the issue of informed consent and "more probably than not affected the judgment." This portion

of her testimony therefore constitutes reversible error.

This issue is sustained.

Plaintiffs' fourth issue is: "Whether the court erred by refusing to allow the plaintiffs to introduce into evidence the informed consent form presently being used by Dr. Arrowsmith and by refusing to allow Dr. Arrowsmith to be cross-examined concerning that form."

■ Defendant revised the informed consent form in March 1985, more than one year after plaintiff had signed two separate "consent" forms. The revised consent form went into more specific detail concerning radial keratotomy surgery and the complications which could arise from the surgery than did the consent form signed by plaintiff in 1983 and January 1984.

Defendants moved *in limine* that the trial court exclude the introduction of evidence pertaining to the revised consent form.

The court entered an order on 11 February 1988 reserving a ruling on the admissibility of evidence with respect to the revised consent form until trial.

At trial plaintiffs never offered the revised consent form in evidence and, so far as the record shows, no ruling was made by the trial court on the admissibility of the revised consent form.

The trial court cannot be held to have committed error when it had no opportunity to rule one way or the other. *Turner v. State*, 188 Tenn. 312, 322, 219 S.W.2d 188, 193 (1949).

This issue is without merit.

Plaintiffs' fifth issue is:

Whether the trial court erred by refusing to allow the plaintiffs' counsel to argue that the defendant was guilty of professional negligence by virtue of having failed to return or to see that someone in his office returned Mr. Cary's telephone calls during the week prior to his retinal detachment in June of 1984, by refusing to grant plaintiffs' counsel's motion for an amendment to conform to the evidence to allow such an argument and by holding that such evidence of professional negligence would require testimony from an expert witness.

■ Plaintiff testified that during the week prior to his retinal detachment he noticed a gradual loss of vision in his eye which first manifested itself in the form of a black spot in the lower corner of his vision, which subsequently enlarged over the course of the next few days as his retina continued to detach. During this time he testified that he called the defendant's office on several occasions because of his concern over his loss of vision and that his phone calls were not returned by defendant or anyone in defendant's office.

Plaintiff insists that the failure on the part of defendant or his employees to return these calls constituted negligence in plaintiff's post-operative care.

Plaintiff also testified that he never told anyone in defendant's office why he was calling on those occasions. The defendant was out of town during the entire time in which the plaintiff was calling and he did not mention to anyone in defendant's office that he was having problems. The first time that plaintiff told someone in defendant's office about the nature of his problem, he was immediately referred to an ophthalmologist for an emergency diagnosis and treatment.

The facts simply do not support the allegation of negligence on defendant's part in failing to return plaintiff's phone calls.

The trial court correctly refused to grant plaintiff's motion to be allowed to amend to conform the evidence to allow plaintiffs to argue that defendant was guilty of professional negligence by failing to return, or to see that someone in his office returned, plaintiff's telephone calls.

It can be inferred that if there was any negligence in this episode, it is simply that plaintiff himself was negligent in failing to tell anyone in defendant's office the nature of his problem. There are no facts in this record upon which a basis for an amendment to the pleadings to show professional

negligence could be grounded. This issue is without merit.

Plaintiffs' sixth issue is:

Whether the court erred by holding that the use of prescription medications ordered for the care and treatment of a patient by his physician cannot form the basis for an action against the physician for lack of informed consent and by refusing to allow the jury to consider the question of whether Mr. Cary gave his informed consent to the treatment of his post-operative complications with phospholine iodide eyedrops.

The jury was instructed on the issue of whether defendant was professionally negligent to have prescribed phospholine iodide eyedrops for plaintiff's use. The jury by its verdict found that the defendant was not guilty of negligence in so prescribing.

 The trial court refused to instruct the jury on the issue of whether plaintiff had given his informed consent to the treatment of his post-operative complications with phospholine iodide eyedrops.

We are of the opinion that the trial court properly refused to so charge. The doctrine of lack of informed consent is based upon "battery." "If informed consent is not effectively obtained, the defendant's departure from the standard care is not negligence but *battery....*" *Cardwell v. Bechtol,* 724 S.W.2d 739, 750 (Tenn.1987) (emphasis supplied). "[I]f no battery can be shown, then the issue clearly emerges as one of malpractice." *Id.* at 751. A battery necessarily requires an unpermitted touching of the plaintiff by the defendant or by some object set in motion by the defendant. 6A C.J.S. *Assault and Battery* § 8(b) (1975).

In *Boyer v. Smith,* 345 Pa.Super. 66, 497 A.2d 646 (1985), the defendant doctor had warned of some, but not all, side effects of the drug butazolidin. One of the side effects he did not warn of was an adverse allergic reaction. The plaintiff patient later suffered an adverse allergic reaction. At trial the plaintiff requested the trial court to charge the jury on the theory of informed consent. The trial court refused the request.

In affirming the trial court, the appellate court concluded that the doctrine of informed consent should continue to be limited in its applicability to only those cases involving surgical or operative medical procedures and not expanded to therapeutic treatment which is usually an on-going treatment upon examination by a treating physician. The court stated:

To now expand the doctrine's current applicability to cases involving the administration of therapeutic drugs would be to radically depart from, and indeed obliterate, the foundation upon which the [battery theory of informed consent] stands. Not only are we unpersuaded that such expansion is unnecessary.... [W]e are also of the particular opinion that, in the light of the day-to-day realities of providing professional medical care, traditional medical malpractice actions, sounding in negligence, are an adequate legal medium for compensating patients for the injurious consequences of therapeutic drug treatment.

*Boyer,* 497 A.2d at 649.

We are of the opinion that the better rule is that a treating physician must obtain the patient's informed consent for the medical treatment of the patient and not for each component part of the treatment process. The patient has an adequate legal remedy, *i.e.,* a malpractice action sounding in negligence, for the injurious consequence of therapeutic drug treatment.

This issue is without merit.

Plaintiffs' seventh issue is: "Whether the trial court erred in dismissing the plaintiffs' claim for punitive damages."

 Plaintiff first argues that had the evidence concerning the loss of vision of Larry Hanson and Frank Michitti been allowed, a "proper foundation for an award of punitive damages" would have been "laid." We have heretofore determined the trial court properly excluded that evidence.

Plaintiff also argues that there is "ample proof in the record from which the jury could conclude that Dr. Arrowsmith was simply experimenting with the use of

[phospholine iodide] or using it for no purpose other than to create the false illusion that [plaintiff's] vision was improving."

There is no proof in the record that defendant was "simply experimenting" with phospholine iodide. The proof shows that other physicians used phospholine iodide for treatment of over correction following radial keratotomy surgery. The evidence further shows that defendant was attempting to temporarily reduce the inter-ocular pressure in plaintiff's eye while it healed in order to achieve an acceptable result. Defendant prescribed phospholine iodide only after another drug proved ineffective.

The trial court properly dismissed plaintiffs' punitive damages claim and properly refused to charge the jury as to punitive damages.

Plaintiffs' eighth issue is: "Whether the court erred by making highly prejudicial comments on the evidence through the court's questioning of the plaintiffs' expert witness, Dr. Stephen Feman."

▆ Plaintiffs argue that the trial court made "prejudicial comments on the evidence" in its questions to Dr. Stephen Feman concerning Dr. Feman's testimony that the manufacturer of phospholine iodide had warned in its product literature of reports that phospholine iodide caused retinal detachments. The colloquy between plaintiff's counsel, Dr. Feman, and the trial court on this point is as follows:

MR. TRENTHAM (Plaintiff's counsel): If Your Honor please, I offer his testimony on the issue of notice to Dr. Arrowsmith.

THE COURT: But not of causation?

MR. TRENTHAM: No, sir. Notice to Dr. Arrowsmith of what was in the scientific literature prior to January of '84.

THE COURT: Let me understand more fully, though, whether Dr. Feman says that the literature that accompanied the drug or published by the manufacturer reported any cases of this drug causing retinal detachment.

DR. FEMAN: The literature that was put in with the package by the manufacturer, I'll have to read it exactly, if you'd like.

THE COURT: Does it use the word "cause"?

DR. FEMAN: I don't believe it does. It said it should be used in caution, I think, but I could read it to you. May I go ahead and read it—

THE COURT: I think you should.

DR. FEMAN: Well, number one under "adverse reactions" is a statement, Although the relationship if any of retinal detachment to the administration of Phospholine Iodide has not been established, retinal detachment has been reported in a few cases during the use of Phospholine Iodide in adult patients without a previous history of this disorder.

THE COURT: There was a report of retinal detachment while a person was using the drug?

DR. FEMAN: That's correct.

THE COURT: That does not indicate a causal connection between the two, does it?

DR. FEMAN: Not in the way it states there.

THE COURT: And if the manufacturer had not changed that particular wording for a period in excess of ten years, would it have any meaning?

DR. FEMAN: I don't know what you mean by that.

THE COURT: Well, let's say that the—have you checked whether the manufacturer made that report as early as 1976?

DR. FEMAN: Yes, he had.

THE COURT: And in 1987 does it remain unchanged?

DR. FEMAN: And in 1988 also.

THE COURT: So we have a period in excess of ten years in which there is no change in that particular wording?

DR. FEMAN: That's correct.

THE COURT: And if there had been any report of a causal connection, the manufacturer would surely have changed it, would he not?

DR. FEMAN: I can't speak for the manufacturer. I don't know what the federal guidelines are for that sort of

thing. I know the manufacturer has been litigated against numerous times regarding this.

THE COURT: I was just wondering if the fact that that particular wording showing retinal detachment on the one hand, the use of the drug on the other, for in excess of ten years without any change, without any addition of a causal effect has any meaning in the field of medicine limited to such limited eyes?

MR. TRENTHAM: If Your Honor please, may I make a statement on that?

The witness's testimony has been that the drug has been largely obsolete since 1979, which means the number of cases—

THE COURT: He didn't say obsolete, he said replaced by a better drug.

MR. TRENTHAM: Yes, sir. And what I am suggesting to the Court is that if it has not been widely used at all since 1979, there should be no implication drawn from the fact that there haven't been further cases of retinal detachments, because it's been largely obsolete.

THE COURT: I was only asking the witness that because he used the word "caused" in connection with this same thing.

Plaintiff says that he immediately objected to the court's comments as being improper and prejudicial. We have searched the record and we find nowhere that plaintiff objected to the colloquy.

Further, even if there had been an objection, we find nothing in the comments of the trial judge that would show that he was making "comments on the evidence." The trial judge asked direct questions of Dr. Feman in order to clarify Dr. Feman's testimony. We find nothing which indicates the trial judge expressed his personal opinions or that he had a closed mind on the merits of the case. *Bass v. Barksdale*, 671 S.W.2d 476, 488 (Tenn.App.1984).

Dr. Feman admitted that, contrary to his prior testimony, there was not a single known incident or study or publication that proved a causal relationship between phospholine iodide and retinal detachments.

This issue is without merit.

Plaintiffs' ninth, and last, issue is: "Whether the jury's verdict was against the weight of the evidence and whether the trial judge acting as the thirteenth juror should have set it aside."

"In jury cases, the Court of Appeals has no authority to determine the weight or preponderance of the evidence." *Cohen v. Cook*, 62 Tenn.App. 292, 303, 462 S.W.2d 502, 507 (1969): *Havron v. Page*, 25 Tenn. App. 367, 370, 157 S.W.2d 856, 858 (1941).

 Plaintiff also argues that the trial court as the thirteenth juror should have set the verdict aside. This issue as framed by the plaintiff is not reviewable. Once the jury's verdict is approved by the trial court, then our review is limited to a determination of whether there is any material evidence to support the verdict. *Poole v. Kroger Co.*, 604 S.W.2d 52, 54 (Tenn.1980). Plaintiff has not presented as an issue whether there is material evidence to support the verdict.

This issue is without merit.

For the reasons set forth under issue three, the judgment of the trial court is reversed and the cause remanded to the trial court for a new trial and the collection of costs which are assessed to the defendant-appellee.

TODD, P.J., and KOCH, J., concur.

ORDER ON PETITION TO REHEAR

The defendants-appellees' most respectful petition to rehear has been considered by the Court and found to be without merit.

It is therefore ORDERED that the petition be and the same is hereby overruled.